KUSKIN, J.T.C.
Plaintiff Robert Oberhand, executor of the Estate of Cynthia A. Oberhand (the “Estate”), appeals an assessment of New Jersey estate tax imposed by defendant, Director of the New Jersey Division of Taxation (the “Director”). The assessment, in the amount of $25,915.49 plus interest, resulted from the retroactive application of amendments to N.J.SA. 54:38-1 enacted after the date of death of Cynthia Oberhand (“Mrs. Oberhand”). The amendments constituted New Jersey’s response to changes in the federal estate tax law. Under their express provisions, the amendments were effective as of a date preceding Mrs. Ober-hand’s date of death.
Both parties have moved for summary judgment. For the reasons set forth below, I hold that the Estate is not liable for the tax and interest assessed.
Mrs. Oberhand died on March 28, 2002, leaving a residuary estate in the sum of $863,905.29 available for distribution. Her Will (the “Will”) is dated April 3, 1998 and was admitted to probate on May 10, 2002. On January 6, 2003, the Estate filed a New Jersey Resident Decedent Estate Tax Return together with *58 a copy of the Estate’s federal estate tax return (which was also filed on or about the same date). As of the date this matter was heard, no distributions of the residuary estate had occurred.
The Will named Robert Oberhand (“Mr. Oberhand”), Mrs. Oberhand’s husband, as executor and trustee, and established two trusts, a Marital Trust and a Family Trust, to which the residuary estate was to be distributed. The Marital Trust was to receive an amount, denominated as the “marital amount” in the Will and defined as property having a value exceeding the sum of: (1) “the maximum amount, if any, that can pass pursuant to this Will free of federal estate tax ... after taking into account ... any credit against that tax allowable to my estate (except that the credit for state death taxes under Section 2011 of the [Internal Revenue] Code shall be taken into account only to the extent that state death taxes ... are not increased thereby),” (2) specific bequests, and (3) deductible debts and administration expenses. Any amount in excess of the marital amount was to be distributed to the Family Trust.
Mr. Oberhand was the beneficiary of both trusts. Under the terms of the Marital Trust, he was to receive all income, and the trustee had discretion to distribute principal to him for his “health, maintenance and support.” Under the terms of the Family Trust, income and principal were to be distributed to Mr. Oberhand to the extent the trustee deemed distributions “advisable to provide for [his] health, maintenance, support and education.” However, principal of this Trust could not be distributed until the Marital Trust was exhausted. Undistributed income was to be accumulated and added to the principal of the Trust. Upon Mr. Oberhand’s death, the principal of both trusts was to be distributed to Mrs. Oberhand’s children and stepchildren.
As of the date the Will was prepared, and as of the date of Mrs. Oberhand’s death, New Jersey estate tax was integrated with the federal estate tax and equaled “the sum by which the maximum credit allowable against any federal estate tax payable to the United States under any federal revenue act on account of taxes paid to any state ... shall exceed the aggregate of all estate, *59 inheritance, succession or legacy taxes actually paid to any state ..., including ... [New Jersey]____” L. 1934, c. 243, § 1 (amended 2002).[1] The Internal Revenue Code imposed federal estate tax under I.R.C. § 2001, which established a progressive scale of taxation based on the value of the estate. Under I.R.C. § 2010, a credit was provided against the estate tax otherwise payable under § 2001. The amount of the credit equaled the taxes that would be payable for a specified exclusion amount. As of the date of the Will and Mrs. Oberhand’s date of death, the exclusion amount was $675,000 for 2001 and $700,000 for 2002. The credit for estate taxes under I.R.C. § 2011 to which the parenthetical clause in the definition of “marital amount” referred, equaled the amount of “any estate, inheritance, legacy, or succession taxes actually paid to any State or the District of Columbia, in respect of any property included in the gross estate....” I.R.C. § 2011(a). The credit was to be computed based on the value of the adjusted taxable estate, defined in I.R.C. § 2011(b)(3) as the taxable estate less $60,000. Because of the manner in which New Jersey estate tax was calculated when the Will was prepared, the definition of “marital amount,” incorporating Mrs. Oberhand’s desire that the Estate be “free of federal estate tax,” necessarily included a desire that the estate be free of New Jersey estate tax. The distribution provisions of the Will were structured to accomplish this purpose.
On June 7, 2001, the United States Congress enacted the Economic Growth and Tax Relief Reconciliation Act of 2001, Pub.L. No. 107-16,115 St,at. 38 (2001), which amended the federal estate tax laws in two respects significant to this matter. The first was to increase the exclusion amount under I.R.C. § 2010 for the year 2002 from $700,000 to $1,000,000. Pub.L. No. 107-16, *60 § 521(a), 115 Stat. 38, 71 (2001). The second was to phase out, in increments of 25% per year starting in 2002, the state death tax credit contained in I.R.C. § 2011. Pub.L. No. 107-16, § 531(a)(3), 115 Stat. 38, 72-73 (2001). As a result of these changes in the federal estate tax law, concern arose in New Jersey as to the potential loss of estate tax revenue. Legislation intended to address this concern was introduced on March 25, 2002 as Senate Bill 1378. The Statement to the bill included the following:
New Jersey’s estate tax is based on a credit allowed by federal law against the federal estate tax for the payment of inheritance or other legacy taxes imposed by the several states. The State estate tax is designed to absorb the excess (if any) of the maximum amount of this federal credit over the cumulative liability of a decedent’s heirs for New Jersey inheritance tax on transfers from the decedent’s estate.
Under changes in the federal estate tax enacted in 2001, New Jersey’s estate tax will be reduced. This reduction will occur primarily through a four--year phase-out of the federal credit. Even before the phase-out is completed, the credit (and thus liability for New Jersey estate tax) will also be reduced for many estates by the extension of full exemption from federal tax to successively larger estates.
This bill preserves the New Jersey estate tax as it existed up to the point at which the changes in federal law took effect by providing that the tax would be computed as though the terms of the federal estate tax, including those governing liability for that tax and allowance of the state legacy tax credit, continued to apply to the estates of resident decedents dying after December 31, 2001 as they did to that of a resident decedent dying on that date.
[Statement to Senate Bill No.1378, at 4 (March 25, 2002).]
An identical bill was introduced in the Assembly as Assembly Bill No. 2302 on May 9, 2002. The Senate Budget and Appropriations Committee amended S. 1378 and the Assembly Budget Committee amended A. 2302. Eventually, the Assembly bill was substituted for the Senate bill, and A 2302, as amended, was enacted by the Legislature. The legislation was signed by the Governor and became effective on July 1, 2002. L. 2002, c. 31, § 1. It effected a total revision of N.J.S.A. 54:38-1, and included the addition to the statute of the following provisions pertinent to this matter (the “Amendments”):
(a) In addition to the inheritance, succession or legacy taxes imposed by this State ... there is hereby imposed an estate or transfer tax:
(2)(a) Upon the transfer of the estate of every resident decedent dying after December 31, 2001 which would have been subject to an estate tax payable to the United States under the provisions of the federal Internal Revenue Code of 1986 *61 (26 U.S.C. s.l et seq.), in effect on December 31, 2001, the amount of which tax shall be, at the election of the person or corporation liable for the payment of the tax under this chapter, either
(i) the maximum credit that would have been allowable under the provisions of that federal Internal Revenue Code in effect on that date against the federal estate tax that would have been payable under the provisions of that federal Internal Revenue Code in effect on that date on account of taxes paid to any state or territory of the United States or the Distinct of Columbia,
[N.J.S.A. 54:38-1(a).]
Paragraph 2(a)(ii) provided for an alternate tax computation not relevant here. Paragraph 2(b) provided for a reduction in the tax liability determined under paragraph 2(a) equal to the aggregate amount of estate, inheritance, succession, and legacy taxes actually paid to New Jersey or elsewhere in the United States, but limited the amount of the reduction to “the proportion of the tax otherwise due under this subsection that the amount of the estate’s property subject to tax by other jurisdictions bears to the entire estate taxable under this chapter.” N.J.S.A. 54:38-1(a)(2)(b).
The Statements to the Senate and Assembly amendments to the original bills introduced in those bodies retained the language quoted above from the Statement to the initial version of S. 1378, and added a “Fiscal Impact” discussion. Both the Senate Budget and Appropriations Committee and the Assembly Budget Committee Statements contained the following language relating to the significance of the federal Economic Growth and Tax Relief Reconciliation Act of 2001 on New Jersey estate tax collections:
Data obtained by the Office of Legislative Services (OLS) from the Division of Revenue, Department of the Treasury, indicate that in FY 2001 estate tax revenues constituted approximately forty-five percent of total annual inheritance tax collections. Accordingly, of the $500 million in inheritance tax collections anticipated by the Executive (based on its year-end revised estimate) for FY 2002, approximately $225 million can be attributed to the New Jersey estate tax. Similarly, based on the Executive’s revised FY 2003 revenue estimates, which project a total of $530 million in inheritance tax collections, roughly $239 million will be due to the estate tax.
Based on this data, and the federal phase-out provision [of the credit allowed for estate, inheritance, legacy, or succession taxes paid to any state], the OLS estimates that the General Fund will forego approximately $60 million in FY 2003, $120 million in FY 2004; $180 million in FY 2005 and the full $240 million currently collected by FY 2006 and each year thereafter under current law____ With *62 enactment of this substitute, however, the General Fund would effectively be “held harmless” from results of the changes to the federal tax code.
[Assembly Budget Committee, Statement to Assembly Committee Substitute fi/r A. 2302, at 2-3 (June 10, 2002); Senate Budget and Appropriations Committee, Statement to Senate Committee Substitute for S. 1378, at 2-3 (June 27, 2002).]
Because the Amendments were effective as of January 1, 2002, the Director, in reliance on them provisions, assessed New Jersey estate tax against the Estate even though Mrs. Oberhand’s date of death was March 28, 2002. Plaintiff does not dispute that, if tax is due, the amount of tax calculated by the Director is correct. Plaintiff contends, however, that summary judgment should be granted in favor of the Estate, determining that no tax or interest is due, on three bases: (1) the Amendments were not intended to impose tax on an estate that would have paid no tax if the date of death had occurred on or before December 31, 2001; (2) the retroactive application of the Amendments constitutes an unconstitutional denial of due process; and (3) even if the retroactive application of the Amendments is constitutional, applying the amendments retroactively to the Estate would be manifestly unjust. The Director asserts that plaintiff has misinterpreted the Amendments, that the Amendments are constitutional, and that no taxpayer has the right to rely on the continued operation of existing tax laws and, therefore, no manifest injustice results from application of the Amendments to the Estate.
I will address the statutory interpretation issue first, then the constitutional issue, and lastly the manifest injustice issue.
I.
Statutory Interpretation
Often a court must determine whether the language of a statute or its legislative history supports retroactive application. Here, however, no such determination is required because retroactive application of Amendments is required by their express language. See Nobrega v. Edison Glen Assocs., 167 N.J. 520, 531, 772 A.2d 368 (2001) (holding that a court must recognize an unequivocal expression of legislative intent that a statute apply retroactively).
*63 As the primary support for his argument that the Amendments were not intended to apply retroactively to a situation where no tax would have been payable if a decedent had died on or before December 31, 2001, plaintiff relies on the language of N.J.SA 54:38-l(a)(2)(a) imposing tax on the transfer of an estate of a decedent dying after December 31, 2001 “which would have been subject to an estate tax payable to the United States” under the provisions of the Internal Revenue Code as in effect on December 31, 2001. Plaintiff asserts that this language demonstrates a legislative intent not to impose a tax on an estate which otherwise would not have been taxable under the law in effect as of December 31, 2001. Therefore, the retroactive applicability of the amendments to the six-month period (January 1, 2002 through June 30, 2002) preceding their July 1, 2002 enactment date was intended to impose estate tax only in those circumstances where tax would have been payable even if the date of death was December 31, 2001 or earlier. Plaintiff further asserts that, if Mrs. Oberhand had died in 2001 on or before December 31, the portion of her residual estate distributed to the Family Trust would have been equal to the then applicable federal estate exclusion amount, $675,000, with the balance distributed to the Marital Trust. As a result of the combination of the marital deduction available to the estate for amounts distributed to the Marital Trust and the exclusion, no federal estate tax would have been payable, no credit against federal estate tax would have been available for estate, inheritance, legacy or succession taxes payable to New Jersey, and, consequently, no New Jersey estate tax would have been payable.
The Director asserts that plaintiffs interpretation would eviscerate the Amendments and defeat the legislative intent to protect against a significant loss of revenue. The Director describes plaintiffs statutory interpretation as not limited to the period of retroactivity encompassed by the Amendments, but as necessarily applying whenever a decedent might die. Thus, the Director argues that, even for someone dying well after July 1, 2002 (the date of enactment of the Amendments), an estate could argue, as does plaintiff, that no tax would have been payable if the date of *64 death was on or before December 31, 2001 and therefore no tax should be payable based on the actual date of death.
The Director is correct in asserting that plaintiffs statutory interpretation argument cannot be confined to the period of retroactive application of the Amendments. Any estate could make the same argument as plaintiff, regardless of the actual date of death of a decedent. I conclude that the Legislature did not intend the Amendments to function as plaintiff contends. Plaintiffs interpretation would seriously undercut the revenue preservation purpose of the Amendments, and I reject plaintiffs statutory interpretation for this reason.
I also reject plaintiffs interpretation of the Amendments because I construe the Senate and Assembly Committee Statements to A. 2302 and S. 1378 to require that estate tax be determined under the Amendments based on estate distributions as governed by the laws in effect on the date of death. Tax is not to be determined, as plaintiff argues, by hypothesizing, or speculating as to, the distribution of estate assets that would (or might) have occurred if a decedent’s date of death were on or before December 31, 2001. As quoted above, the Committee Statements provide that the Amendments were intended to result in computation of New Jersey estate tax “as though the terms of the federal estate tax, including those governing liability for that tax and allowance of the state legacy tax credit, continued to apply to the estates of resident decedents dying after December 31, 2001 as they did to that of a resident decedent dying on that date.” Senate Budget and Appropriation Committee, Statement to Assembly Committee Substitute for Assembly No. 2302 at 1 (June 27, 2002); Assembly Budget Committee, Statement to Assembly Committee Substitute for Assembly No. 2302 at 1 (June 10, 2002). This language indicates that, under the Amendments, the Director’s responsibility is simply to determine estate distributions under the law in effect on the date of death and apply to those distributions the federal estate tax law in effect on December 31, 2001.
Pursuant to the preceding discussion, the Estate’s liability for New Jersey estate tax should be determined based on the provi *65 sions of the Will and federal estate tax law in effect on Mrs. Oberhand’s date of death, March 28, 2002. The Will directed distribution to the Family Trust in an amount equal to the maximum amount that could be transferred free of federal estate tax. That amount, in 2002, was $1,000,000. Therefore, under the Will, the amount to be transferred to the Family Trust was the entire residuary estate of $868,905.29. Under the federal estate tax law in effect as of December 31, 2001, the portion of the distribution in excess of $675,000 would have been subject to federal estate tax, and the federal tax credit under I.R.C. § 2011 would have been available against the federal estate tax liability. New Jersey estate tax would be payable in an amount equal to the maximum credit, less any estate, inheritance, legacy, or succession taxes otherwise paid.
II.
Constitutionality of the Amendments
Because I have interpreted the Amendments in a manner which supports the Director’s imposition of tax, I now must address plaintiffs arguments as to the constitutionality of the retroactive application of the Amendments and as to manifest injustice. The latter is a non-constitutional argument, and, ordinarily, I would address that argument first. However, our courts have recognized that the constitutionality of a statute can inform, but not control, a determination as to manifest injustice. In re D.C., 146 N.J. 31, 58, 679 A.2d 634 (1996) (“Hence, while our inquiry into whether there has been a ‘manifest injustice’ [in the retroactive application of a statute] is informed by our consideration of issues of constitutional due process, it is not necessarily determined by those issues.)” Consequently, I will address the constitutional issue before the manifest injustice issue.
In general, legislation is presumed to be constitutional. “Only a statute ‘clearly repugnant to the Constitution’ will be declared void.” Town of Secaucus v. Hudson County Bd. of Taxation, 133 N.J. 482, 493, 628 A.2d 288 (1993), cert. denied sub nom. City of Bayonne v. Town of Secaucus, 510 U.S. 1110, 114 *66 S.Ct. 1050, 127 L.Ed.2d 372 (1994) (citation omitted). The standard to be used in determining whether retroactive legislation is constitutional was set forth by our Supreme Court in Nobrega, supra, 167 N.J. 520, 772 A.2d 368. There, the Court determined that its previous constitutional analysis of retroactivity based on vested rights was no longer appropriate, noting that the United States Supreme Court had adopted a different standard.
A consistent line of decisions by the United States Supreme Court interpreting the Due Process Clause of the Fourteenth Amendment holds that retroactive legislation does not deprive parties of due process if the legislation “is supported by a legitimate legislative purpose furthered by rational means.” Those decisions do not engage in a “vested rights” inquiry. The standard they apply — the familiar “rational basis” test — is the same standard that is applied to legislation generally when challenged on due process grounds.
[Id. at 542-43, 772 A.2d 368 (citation omitted).]
Our Supreme Court relied on Usery v. Turner Elkhorn Mining Co., 428 U.S. 1, 96 S.Ct. 2882, 49 L.Ed.2d 752 (1976) for the principle that both the retroactive aspects and the prospective aspects of legislation must meet the due process test, and justifications for prospective application may not be sufficient to justify retroactive application. In either event, the party claiming a denial of due process has the burden of establishing that the legislative action is arbitrary and irrational. Nobrega, supra, 167 N.J. at 543-44, 772 A.2d 368.
In applying the rational basis test to the Amendments, I conclude that the amendments and their retroactive application do not violate the due process clause of either the federal or state constitutions. U.S. Const. amend. XIV, § 1; N.J. Const, art. I, § 1, ¶ 1. The rational basis test includes two elements — (1) whether the legislation furthers a legitimate legislative purpose and (2) whether the Legislature rationally could have believed that the legislation would help achieve that purpose. See Western & Southern Life Ins. Co. v. State Bd. of Equalization, 451 U.S. 648, 671-72, 101 S.Ct. 2070, 2084-85, 68 L.Ed.2d 514, 532-33 (1981). As described above, the express purpose of the Amendments was to prevent the loss of significant revenue resulting from federal legislation anticipated to reduce substantially New Jersey estate tax collections. This is a legitimate legislative purpose. The *67 Legislature is responsible for raising revenue to fund the operations of government. Cf. N.J. Const, art. IV, § 6, ¶ 1.
As to the second part of the rational basis test, I conclude that the Legislature rationally could have believed that applying the Amendments retroactively would further their revenue preservation purpose. Retroactive application could prevent the loss of revenue anticipated in the budgets for fiscal years 2002 (July 1, 2001 to June 30, 2002) and 2003 (July 1, 2002 to June 30, 2003). The anticipated revenue loss for fiscal year 2003 could be attributable in part to deaths occurring during the period of retroactive application because New Jersey estate tax returns and payment of tax are not due until nine months after the date of death. N.J.S.A. 54:38-5. Therefore, taxes relating to a deaths occurring during the period January 1, 2002 and June 30, 2002 were unlikely to be paid until fiscal year 2003.
Whether the Legislature could have selected a different and, perhaps, better means of accomplishing its purpose is not the issue. Legislation will survive constitutional scrutiny so long as the methodology employed by the Legislature is rational, whether or not a court considers the methodology to be the most appropriate one available. See Greenberg v. Kimmelman, 99 N.J. 552, 563, 494 A.2d 294 (1985) (“[I]f a statute is supported by any conceivable rational basis, it will withstand a substantive due process attack.”); White v. North Bergen Tp., 77 N.J. 538, 554, 391 A.2d 911 (1978) (“It goes without saying that the wisdom, good sense, policy and prudence (or otherwise) of a statute are matters within the province of the Legislature and not of the Court.”). Here, I conclude that the Legislature has enacted a rational means of accomplishing the purpose of raising sufficient revenue for governmental operations. The retroactive application of the Amendments is part of that rational means. Because the Amendments satisfy both aspects of the rational basis test, I conclude that their retroactive application to the Estate does not violate due process. See Klebanow v. Glaser, 80 N.J. 367, 403 A.2d 897 (1979) (holding that retroactive application of New Jersey’s capital gains tax, enacted on August 4,1975, to gains received on or after January 1, 1975, was constitutional).
*68 III.
Manifest Injustice
Even if retroactive legislation satisfies the constitutional test, the legislation may be unenforceable in New Jersey under particular factual circumstances under the doctrine of manifest injustice. Our Supreme Court defined this doctrine as follows:
The “manifest injustice” test “does not flow from constitutional requirements, but instead is based on equitable concerns.”
... We made explicit the equitable element of our retroactivity jurisprudence two decades ago in Gibbons v. Gibbons, supra, 86 N.J. at 523-25, 432 A.2d 80. There, we upheld the retroactive application of an amendment to the divorce statute, N.J.S.A 2A:34-23. After determining that the statute was otherwise subject to retroactive application, we defined the scope of the “manifest injustice” inquiry as follows:
[T]he essence of this inquiry is whether the affected party relied, to his or her prejudice, on the law that is now to be changed as a result of the retroactive application of the statute, and whether the consequences of this reliance are so deleterious and irrevocable that it would be unfair to apply the statute retroactively.
[Nobrega, supra, 167 N.J. at 545-46, 772 A.2d 368 (citations omitted).]
As the preceding quotation indicates, the manifest injustice doctrine is one based on fairness and equity. It emanates from the “fundamental principle of jurisprudence that retroactive application of new laws involves a high risk of being unfair.” Gibbons v. Gibbons, 86 N.J. 515, 522, 432 A.2d 80 (1981). Our Supreme Court also has stated that “the determination of whether ‘manifest injustice’ exists requires a weighing of the public interest in the retroactive application of the statute against the affected party’s reliance on the previous law, and the consequences of that reliance.” Nelson v. Board of Ed. of Old Bridge Tp., 148 N.J. 358, 372, 689 A.2d 1342 (1997). In making the determination, a court must “look to matters of unfairness and inequity. In the typical setting concerning ‘manifest injustice’ reliance on existing law by the affected party and the unfairness of changing that law are the important factors in making the retroactivity decision.” In re D.C., supra, 146 N.J. at 58, 679 A.2d 634 (citation omitted).
Based on the preceding discussion, I conclude that, in determining whether the retroactive application of the Amendments to the Estate results in manifest injustice, I must weigh the public *69 interest in retroactive application against Mrs. Oberhand’s reliance on the law in effect as of her date of death and the consequences of that reliance. The issue ultimately is one of fairness and equity, and consequently, her reliance on existing law and the unfairness of changing the law are “the important factors in making the retroactivity decision.” In re D.C., supra, 146 N.J. at 58, 679 A.2d 634.
As set forth above in the constitutional discussion, the public interest in the adoption of the Amendments was the preservation of the State’s revenue stream which was threatened by changes in the federal estate tax law. As quoted above, the Senate and Assembly Committee Statements with respect to the Amendments articulated the fiscal concerns and the potential loss of revenue in the absence of any legislative response by New Jersey. Because the projected loss of revenue was significant, the public interest in the legislation generally is strong. The strength of the public interest in the retroactive application of the statute, however, is less clear. The Committee Statements refer to projected revenue losses commencing in fiscal year 2003 (July 1, 2002 through June 30, 2003), but do not segregate the projected loss of revenue attributable to deaths occurring during the second half of fiscal year 2002, the period of retroactive application of the Amendments, from the projected loss attributable to deaths occurring during fiscal year 2003. Because estate tax payments are not due until nine months after the date of death, the loss during fiscal year 2003 attributable to deaths during the retroactive application realistically cannot be projected.
The Director does not dispute that, in preparing the Will and not amending it prior to her death, Mrs. Oberhand relied on the then existing law under which, as explained above, neither federal nor New Jersey estate tax would have been due. Although S. 1378 was introduced in the Senate three days before Ms. Ober-hand’s date of death, I conclude that she is not chargeable with notice of the introduction of the legislation, both because of the proximity of the date of introduction to her date of death and because the mere introduction of legislation does not necessarily constitute notice to the public that a change in law is imminent. *70 But see Klebanow v. Glaser, supra, 80 N.J. at 369-70, 403 A.2d 897 (suggesting that, in determining whether retroactive application of tax statute violates the Due Process Clause, a court should treat a taxpayer as having constructive notice of legislation introduced four months before he moved to New Jersey and six months before he sold stock in reliance on existing law). Consequently, as of her date of her death, Mrs. Oberhand had no reason to believe that any modification of her Will was necessary in order to avoid federal and New Jersey estate tax. As discussed above, the avoidance of these taxes was an essential element of her estate plan.
Every testator is entitled to assume, absent evidence to the contrary, that his lawyer will undertake to accomplish his testamentary wishes with as little tax impact as possible. Furthermore, it is normally and quite rationally presumed that this is what the testator wishes. Any other belief, absent evidence to support it, is fatuous.
[In re Estate of Ericson, 74 N.J. 300, 309, 377 A.2d 898 (1977).]
Although the foregoing analysis suggests that retroactive application of the Amendments to the Estate, although constitutional, would be manifestly unjust, one additional factor must be considered pursuant to Nobrega, supra, 167 N.J. 520, 772 A.2d 368. There our Supreme Court incorporated in its manifest injustice analysis the concept that “a key element in evaluating retroactive change is whether the Legislature has denied a claimant all remedies or has modified available remedies.” Id. at 548, 772 A.2d 368 (citation and internal quotation marks omitted). In Nobrega, the plaintiffs sought relief under the New Residential Real Estate Off-Site Conditions Disclosure Act, N.J.S.A 46:3C-1 to -12 (the “Off-Site Act”), based on the defendant’s failure to disclose the proximity of plaintiffs’ various lands to toxic waste sites. The defendant contended that provisions of the Act exonerating sellers from liability for non-disclosure of off-site conditions prior to the effective date of the Act should be applied retroactively. The Supreme Court determined that some or all of the plaintiffs may have had a cause of action for the same remedy under the Planned Real Estate Development Full Disclosure Act (the “Full Disclosure Act”). The Court declined to determine whether retroactive application of the Off-Site Act would result in *71 manifest injustice until the trial court determined which, if any, of the plaintiffs had available a remedy under the Full Disclosure Act. As to plaintiffs having such a remedy, the Court held that retroactive application of the Off-Site Act would not be manifestly unjust because those plaintiffs could pursue their claims under the Full Disclosure Act. Id. at 549-50, 772 A.2d 368.
The Nobrega discussion of alternate remedies is relevant here because plaintiff may have an ability to effect reformation of the Will so that distribution of the Estate could be made in a manner that would eliminate the imposition of New Jersey estate tax. Both parties acknowledge that a reformation action remains timely, and my research has disclosed no procedural impediment to the filing of such an action. The willingness of our courts to grant reformation under circumstances such as these is reflected in our Supreme Court’s decision in In re Estate of Branigan, 129 N.J. 324, 609 A.2d 431 (1992). There, the decedent established two trusts, one for his wife and the other for his children and grandchildren. Before his death, the decedent had failed to modify his Will in order to take advantage of changes in federal estate tax laws. As a result, the estate was subject to substantial federal estate taxes applicable to the trust established for the children and grandchildren.
After noting that the decedent’s Will was a “carefully-crafted document prepared and executed under the direction and guidance of skilled lawyers expert in matters of testamentary dispositions and estates, including tax considerations and consequences,” id. at 327, 609 A.2d 431, the Court invoked the doctrine of probable intent and concluded that minimizing federal taxes was a significant factor in the decedent’s estate plan. Id. at 331-335, 609 A.2d 431.
In addition to the extrinsic evidence supporting decedent’s specific intent to minimize taxes, the doctrine of probable intent reasonably assumes, in its several possible applications, a widely-accepted intent on the part oí most testators to save taxes. The basic principle underlying the doctrine of probable intent is that it is reasonable to impute to the decedent a general intent that reflects “impulses ... common to human nature.”
[Id. at 335, 609 A.2d 431 (citation omitted).]
*72 The Court held that, to the extent the modification would constitute “only a technical alteration relating to an aspect of estate administration that does not otherwise appear to have any material bearing on the decedent’s testamentary plan,” reformation of the decedent’s will should be permitted in order to accommodate the testator’s probable intent to minimize taxes. Id. at 336, 609 A2d 431. The Court refused to permit a modification of the will that would “alter [its] dispository provisions.” Id. at 337, 609 A.2d 431.
In order for plaintiff to avoid the imposition of New Jersey estate tax here, the Will would have to be reformed to permit the distribution to the Family Trust of no more than $675,000, with the balance distributed to the Marital Trust. This would not result in any federal estate tax liability and would eliminate the New Jersey estate tax liability resulting from the retroactive application of the Amendments. The success of a reformation action is not assured because the residual beneficiaries of the trusts might object on the grounds that the distribution of income is mandatory under the Marital Trust but discretionary under the Family Trust, where any undistributed income accumulates and is distributed with principal upon Mr. Oberhand’s death. Therefore, a reduction of the principal amount of the Family Trust in favor of the Marital Trust might work to the detriment of the residual beneficiaries.[2]
In Nobrega, the Supreme Court held that the mere availability of an alternate remedy would eliminate manifest injustice. There, the Full Disclosure Act provided essentially the same relief as the Off-Site Act, and the plaintiffs could prevail under one act only if they also could prevail under the other. Therefore, the availability of relief under the Full Disclosure Act would eliminate any manifest injustice resulting from retroactive application of provisions of the Off-Site Act to preclude relief under that Act. The situation here is not directly analogous. The issues and relief *73 available in a reformation action are very different from the issues and relief now sought by plaintiff. Failure by plaintiff to prevail in a reformation action would not preclude or resolve plaintiffs claim as to manifest injustice. Therefore, the availability of a reformation action, in itself, does not automatically eliminate the manifest injustice claimed by plaintiff or render the issue moot. As explained above, success by plaintiff in a reformation action would render the issue, and this appeal, moot. Consequently, plaintiff need not pursue a reformation action as a prerequisite to my deciding the manifest injustice issue.
I conclude that retroactive application of the Amendments in this case would be manifestly unjust. The unfairness of imposing tax in the face of Mrs. Oberhand’s reasonable reliance on existing law in (i) preparing the Will with the express intention of minimizing or eliminating all federal and state estate taxes, and (ii) not amending the Will prior to her death, outweighs the public interest in the retroactive application of the Amendments. As described above, the weight I give to the public interest in retroactive application of the Amendments is affected by the absence of any express legislative indication concerning the anticipated revenue loss attributable to the period of retroactive application of the Amendments.
In reaching the foregoing conclusion, I have considered the case authorities discussed by the Director. In support of his argument that imposing New Jersey estate tax retroactively is not manifestly unjust to the Estate because a taxpayer has no “vested right” in the continuation of existing law, the Director cites United States v. Carlton, 512 U.S. 26, 33, 114 S.Ct. 2018, 2023, 129 L.Ed.2d 22, 30 (1994) (stating that “[t]ax legislation is not a promise, and a taxpayer has no vested right in the Internal Revenue Code”). The Carlton decision, however, involved only issues of due process and not the equitable concerns inherent in a manifest injustice analysis. The Director also cites A.H. Robins Co. v. Director, Div. of Taxation, 365 N.J.Super. 472, 485, 839 A.2d 914 (App.Div.), aff'd o.b., 182 N.J. 77, 861 A.2d 131 (2004), as permitting retroactive application of a tax statute. However, that case does not support the Director’s position because there the court found that *74 a seemingly retroactive statute merely set forth existing law and, therefore, “no legitimate issue as to retroactivity” flowed from enactment of the statute. Id. at 485, 839 A.2d 914.
A third decision upon which the Director relies is Harris v. Branin Transport, Inc., 312 N.J.Super. 38, 711 A.2d 331 (App. Div.), certif. denied, 156 N.J. 408, 719 A.2d 640 (1998), particularly its statement that “[t]he application of a [statutory] amendment cannot be said to result in manifest injustice just because it upsets a party’s expectations.” Id. at 48, 711 A.2d 331. In that case, the court interpreted an amendment to the Workers’ Compensation Act that eliminated a credit against benefits for wages earned. The court held that the amendment applied retroactively to benefits being paid to the plaintiff, a widow, at the time of enactment. Branin Transport had argued that retroactive application of the amendment was manifestly unjust because it had a legitimate expectation that, in providing benefits, it would be entitled to the wage credit and because depriving it of the benefit of the credit would negate the insurance carrier’s risk assessment made at the date of death of the employee nineteen years earlier. The Appellate Division found no manifest injustice because neither Branin Transport nor the insurer relied on the petitioner’s earning wages but merely had an expectation that she might become employed. Consequently, as a result of the amendment, neither was in a worse position than it would have been if the plaintiff had never been employed. The court found that the public interest in allowing widows to have the benefit of their earnings outweighed the expectation of employment. Ibid.
The situation before the court in Harris v. Branin Transport was significantly different from that in which the Oberhand Estate finds itself. In Harris, the party claiming manifest injustice did not engage in financial planning based solely on existing law. The workers’ compensation benefit being paid was not affected by the potential credit under existing law, or by the expectations of the employer that the widow would find and maintain employment at a certain wage level. Even if the law had not been amended to eliminate the credit for wages, the widow could have ceased *75 working and been entitled to the same benefit payable to her under the amended statute.
Here, Mrs. Oberhand formulated her estate plan based on existing federal and New Jersey estate tax laws. If the Amendments had not been enacted, the Estate’s New Jersey estate tax obligation would been zero instead of almost $26,000. Hers was not simply an expectation but a reliance interest. The significance to a manifest injustice analysis of this distinction and of financial planning in reliance on current law is demonstrated by our Supreme Court’s decision in State Troopers Fraternal Association v. State, 149 N.J. 38, 692 A.2d 519 (1997). There the unwritten practice of the State Police was to make retroactive pay adjustments to troopers who resigned in good standing. A collective bargaining agreement signed April 26, 1990, but dated and effective as of July 1,1987, provided for pay increases retroactive to its effective date. On September 6, 1988, during negotiations, the New Jersey Department of Personnel promulgated a regulation barring retroactive adjustments for state employees who resigned.
Twelve troopers who resigned between July 1, 1987 and September 6, 1988, sought retroactive pay increases for the period July 1, 1987 to their respective resignation dates. They contended that the regulation was not intended to apply retroactively and that retroactive application would violate due process and cause manifest injustice. The Court held that the regulation was intended to apply retroactively, id. at 54-55, 692 A.2d 519, and that retroactive application did not violate the troopers’ due process rights. Id. at 56-58, 692 A.2d 519. However, the Court held that retroactive application would be manifestly unjust.
We therefore determine that the twelve troopers who resigned between July 1, 1987 and September 6, 1988 are entitled to the retroactive pay adjustment, in spite of the DOP’s preemptive power, because of the reasonable reliance that they may have placed on the continued existence of the State Police practice. Because of their reasonable reliance and resulting change in position, to deny them the adjustment would work a manifest injustice.
[Id. at 56, 692 A.2d 519.]
The Court then defined “the State’s control over governmental expenditures and its responsibility for the public fisc,” id. at 57, 692 A.2d 519, as a public interest that, for purposes of constitu *76 tional analysis, was sufficient to allow the State to impair the troopers’ “private interest ... [in] the receipt of a retroactive pay adjustment.” Ibid. The Court obviously struck a different balance in its manifest injustice analysis.
The principles of State Troopers are directly applicable to the Estate’s manifest injustice arguments. Mrs. Oberhand reasonably relied on existing federal and New Jersey estate tax law in preparing the Will and in not amending it before her death. New Jersey’s fiscal concerns are insufficient to outweigh that reliance, and it would be unfair to apply the Amendments retroactively to impose on the Estate a tax she specifically and expressly sought to avoid by crafting her estate plan in accordance with existing law.
Our Supreme Court’s decision in General Trading Co. v. Director, Division of Taxation, 83 N.J. 122, 416 A.2d 37 (1980) does not affect the preceding analysis and conclusions. There the Court held that a taxpayer was bound by the tax consequences of a business decision. The Director cites this case in support of his contention that plaintiff and Mrs. Oberhand must accept the tax consequences of her “business decisions” as incorporated in the provisions of the Will. The Director’s argument turns General Trading on its head because the argument implies that, in considering a claim of manifest injustice, a court should consider a taxpayer bound by tax consequences resulting from laws that did not exist when a business decision is made, and excuses the State of New Jersey from being bound by its legislative decisions in effect when the decision was made. Even if Mrs. Oberhand’s estate planning decisions may be considered business decisions, the tax consequences of those decisions, under the law existing when they were made, and continuing in effect for three months after her date of death, would have been directly contrary to those the Director now seeks to impose. General Trading suggests that both the Estate and the Director are bound by the tax consequences of estate planning decisions under the factual circumstances present here.
Based on the preceding analysis, I grant plaintiffs motion for summary judgment and deny defendant’s motion.

This is a so-called "pick-up tax” because, as explained in the statement to Senate Bill 1378 (2002) quoted below, the tax was measured by the amount of the maximum federal estate tax credit for state inheritance and estate taxes. Thus New Jersey could receive or "pick up” revenue that would go to the federal government in the absence of the New Jersey tax. This type of provision is common to many state estate tax laws. See e.g. Comptroller of the Treasury v. Phillips, 384 Md. 583, 865 A.2d 590 (2005) and decisions from other states discussed at pages 600-603, 865 A.2d 590.

 The difference between the income distribution provisions of the two trusts may be meaningless because Mr. Oberhand is not only the income beneficiary but also the trustee of both trusts.