940 A.2d 1202

ROBERT OBERHAND, AS EXECUTOR OF THE ESTATE OF CYN-
THIA A. OBERHAND, PLAINTIFF–APPELLANT, v. DIRECTOR,
DIVISION OF TAXATION, DEFENDANT–RESPONDENT.

---

HARRIET SEIDNER, AS EXECUTRIX OF THE ESTATE OF EU-
GENE M. SEIDNER, PLAINTIFF–APPELLANT, v. DIRECTOR,
DIVISION OF TAXATION, DEFENDANT–RESPONDENT.

Argued October 9, 2007—Decided February 27, 2008.

560

*Andrew M. Epstein* argued the cause for appellants (*Lampf, Lipkind, Prupis & Petigrow,* attorneys).

*Mala S. Narayanan,* Deputy Attorney General, argued the cause for respondent (*Anne Milgram,* Attorney General of New Jersey, attorney; *Patrick DeAlmeida,* Assistant Attorney General, of counsel).

Justice WALLACE, JR., delivered the opinion of the Court.

Congress amended the federal estate tax law effective January 1, 2002, in part, to increase the value of assets that could pass free of federal estate tax under the unified credit provision and to phase out the state death tax credit, the source of New Jersey estate tax revenue. To avoid the loss of revenue due to the federal changes, in July 2002, the Legislature amended *N.J.S.A.* 54:38–1 to provide that the New Jersey estate tax would not follow the federal amendments, but would continue to be computed in accordance with the federal state tax credit in effect on December 31, 2001. The statute was made retroactive to January 1, 2002.

In the two estates in this appeal, both decedents died after January 1, 2002, and prior to the adoption of the amendments to *N.J.S.A.* 54:38–1 in July 2002. Each estate administrator filed a State estate tax return reflecting that no taxes were due. The Director of the New Jersey Division of Taxation (Director) imposed estate taxes under *N.J.S.A.* 54:38–1 on both estates. Plaintiffs filed separate actions in the Tax Court contending that the estates should not be subject to the retroactive tax law because the statute was not intended to impose a tax on estates that would not have paid taxes under the law in effect on December 31, 2001. Alternatively, plaintiffs urged that the doctrine of manifest injustice should be applied to eliminate the retroactive aspect of the amendment. The Tax Court held that *N.J.S.A.* 54:38–1 was applicable to the two estates, but that the doctrine of manifest injustice applied to eliminate the retroactive effect of the statute. The Director appealed. The Appellate Division reversed, concluding that the amendment applied to decedents' estates, but that it was error to apply the doctrine of manifest injustice to a tax statute. We granted plaintiffs' petition for certification. We now hold that, although the amendment to *N.J.S.A.* 54:38–1 applies to the estates, under the circumstances presented, the Tax Court properly considered the doctrine of manifest injustice to bar the retroactive application of the statute to plaintiffs.

## I.

The essential facts are not disputed. On April 3, 1998, Cynthia Oberhand (Mrs. Oberhand) executed her Will. She named her husband Robert Oberhand (Mr. Oberhand) executor and trustee, and established two trusts, a Marital Trust and a Family Trust. The Will provided that the maximum amount that could pass free of federal estate tax (essentially, the federal exclusion amount, 26 U.S.C.A. § 2010(c)), would be distributed to the Family Trust, and the balance of the residuary estate would be distributed to the Marital Trust.[1] The formula of the trusts was designed to avoid or limit the amount of federal and state estate taxes. Mr. Oberhand was to receive the net income from the Marital Trust for his life, with discretionary distributions of principal. Under the terms of the Family Trust, Mr. Oberhand was entitled to receive discretionary distributions of income and principal, but could not receive any principal from the Family Trust until the Marital Trust was exhausted. Upon Mr. Oberhand's death, the remainder of both trusts was to be distributed equally to the decedent's and Mr. Oberhand's surviving children. Mrs. Oberhand died on March 28, 2002, leaving an estate valued at $864,905.98. On January 6, 2003, the estate filed a State Estate Tax Return, together with a copy of the federal estate tax return, showing no taxes were due.

Eugene Seidner (Mr. Seidner) executed his Will in 1999. Similar to Mrs. Oberhand's Will, Mr. Seidner's Will provided for a Marital Trust and a Family Trust with appropriate formulas. Mr.

---

[1] This is a simplified version of the trust provision. The actual formula provides that the Marital Trust was to receive an amount denominated as the "marital amount" in the Will and defined as property having a value exceeding the sum of: (1) "the maximum amount, if any that can pass pursuant to this Will free of federal estate tax ... after taking into account ... any credit against that tax allowable to my estate (except that the credit for state death taxes under Section 2011 of the [Internal Revenue] Code shall be taken into account only to the extent that state death taxes ... are not increased thereby)," (2) specific bequests, and (3) deductible debts and administration expenses. Any amount in excess of the marital amount was to be distributed to the Family Trust.

Seidner died on January 25, 2002, survived by his wife, Harriet Seidner (Mrs. Seidner). He left an estate of approximately $744,251.89. On January 15, 2003, the estate filed a State Estate Tax Return, together with a copy of the federal estate return, showing that no taxes were due.

Effective January 1, 2002, Congress amended the federal estate tax laws. Pertinent to this appeal, the amendment included an increase in the amount of property that could pass free of federal estate tax under the unified credit provision (I.R.C. § 2011) from $675,000 to $1,000,000. Those changes had a direct impact on the revenue that New Jersey would receive because the New Jersey estate tax was integrated with the federal estate tax. In an effort to counter the loss of revenue due to the federal changes, the Legislature acted to decouple the New Jersey estate tax from the federal estate tax by amending its estate tax law, *N.J.S.A.* 54:38–1a(2)(a) (the Amendment).

On March 25, 2002, the Senate proposed Senate Bill 1378 to address this concern. The statement to the bill provided in part that

the New Jersey estate tax ... be computed as though the terms of the federal estate tax, including those governing liability for that tax and allowance of the state [death] tax credit, continued to apply to the estates of resident decedents dying after December 31, 2001, as they did to that of a residential decedent dying on that date.

[S.B. 1378, 2002 Leg. 210th Sess. (N.J.2002).]

A similar bill was introduced in the Assembly as Bill No. 2302 on May 9, 2002. A statement identical to that of the Senate bill was appended to the Assembly bill and echoed the concern of the loss of revenue due to changes in the federal estate tax laws. Eventually, the Assembly bill was substituted for the Senate bill and signed into law on July 1, 2002. The Amendment was effective immediately and was made applicable to the estate of any resident dying after December 31, 2001, thus making it retroactive for a six-month period.

The Amendment provided in part as follows:

a. In addition to the inheritance, succession or legacy taxes imposed by this State under authority of chapters 33 to 36 of this title (R.S. 54: et seq.), or hereafter imposed under authority of any subsequent enactment, there is hereby imposed an estate or transfer tax.

(2)(a) Upon the transfer of the estate of every resident decedent dying after December 31, 2001 which would have been subject to an estate tax payable to the United States under the provisions of the federal Internal Revenue Code of 1986 (26 *U.S.C.* s.1 et seq.), in effect on December 31, 2001, the amount of which tax shall be, at the election of the person or corporation liable for the payment of the tax under this chapter, either

(i) the maximum credit that would have been allowable under the provisions of that federal Internal Revenue Code in effect on that date against the federal estate tax that would have been payable under the provisions of that federal Internal Revenue Code in effect on that date on account of taxes paid to any state or territory of the United States or the District of Columbia.

[*N.J.S.A.* 54:38–1a(2).]

At the time decedents executed their respective Wills and as of the dates of their deaths, neither federal nor New Jersey estate taxes would have been due from the estates. Also, if Mrs. Oberhand had died in 2001 when the federal estate credit was $675,000, then her estate of $864,905.98 would have been divided as follows: $675,000 (the then-maximum federal estate tax exclusion) into the Family Trust, and the remaining $189,905.98 into the Marital Trust that qualified for the 26 *U.S.C.A.* § 2056 marital deduction. In that event, no federal or state taxes would have been due. Because of the changes in the federal estate tax law that established an estate credit of $1,000,000 beginning January 1, 2002, after Mrs. Oberhand's death on March 28, 2002, the formula in the Will required the entire estate to pass to the Family Trust.

Similarly, if Mr. Seidner had died in 2001, then his estate of $744,251.89 would have passed as follows: $675,000 into the Family Trust, and the remaining $69,251.89 into the Marital Trust, with no federal or state estate taxes due. Again, as a result of the increase in the federal estate tax credit to $1,000,000, the formula in his Will provided that the executrix should place the entire estate into the Family Trust.

As noted, the Amendment was made retroactive to all estates arising between January 1, 2002 and July 1, 2002, the date on which the Amendment was approved. The Director concluded that the Amendment applied to the two estates. As a result, the Director imposed a tax against Mrs. Oberhand's estate on the $189,905.98 excess above the $675,000 estate credit that passed to the Family Trust, and imposed a tax against Mr. Seidner's estate on the $69,251.89 excess above the $675,000 estate credit that passed into his Family Trust.

Plaintiff, Mr. Oberhand, as Executor of the Estate of Mrs. Oberhand, filed a complaint in the Tax Court contesting the Director's assessment. Plaintiff and the Director subsequently agreed that if New Jersey estate taxes were due, the amount exclusive of interest would be $20,124.09. Following cross-motions for summary judgment, the Tax Court held that the Amendment applied to decedent's estate and that the statute was constitutional. However, the Tax Court concluded that retroactive application of the Amendment resulted in a manifest injustice to the estate; therefore, the court barred the retroactive application of the Amendment to the estate. *Oberhand v. Dir., Div. of Taxation*, 22 *N.J. Tax* 55 (2005). Consequently, the Tax Court vacated the tax assessment against the Oberhand estate.

Plaintiff, Mrs. Seidner, as Executrix of the Estate of Mr. Seidner, also filed a complaint in the Tax Court challenging the application of the Amendment to the estate. In a letter opinion, the Tax Court reversed on the basis of the decision in the *Oberhand* matter.

The Director appealed and the two cases were consolidated. The Appellate Division affirmed the Tax Court's construction of the statute as applying retroactively to the estates and that the statute was constitutional. *Oberhand v. Dir., Div. of Taxation*, 388 *N.J.Super.* 239, 242, 907 *A.*2d 428 (2006). However, the panel disagreed with the Tax Court's conclusion that the doctrine of manifest injustice should apply in the "judicial evaluation of retro-

active tax laws," and reversed the judgments of the Tax Court. *Id.* at 240, 907 *A.*2d 428.

We granted plaintiffs' petition for certification. *Oberhand v. Dir., Div. of Taxation,* 190 *N.J.* 255, 919 *A.*2d 849 (2007).

## II.

Plaintiffs argue that the Amendment does not apply to the estates because the plain language of the statute demonstrates a legislative intent that the six-month retroactive period was intended to impose an estate tax on those instances where the estates would have had to pay a tax if the date of death were December 31, 2001 or earlier. They contend that, if the decedents had died in 2001, the portion of their estate distributed to the Family Trust would have been equal to the then applicable federal estate exclusion amount of $675,000, with the balance distributed to the Marital Trust. Consequently, no tax would have been due. Plaintiffs also urge that even if the statute applies, because it resulted in a harsh and unfair result, the doctrine of manifest injustice should apply to bar the imposition of an estate tax against decedents' estates.

The Director counters that both courts below correctly concluded that the Amendment expressly applies to the estates, and that plaintiffs' interpretation of the Amendment would eviscerate its purpose. The Director explains that plaintiffs' interpretation is not limited to the period of retroactivity expressed in the statute. Therefore, an estate for someone dying after the July 1, 2002 enactment of the Amendment, could argue that no tax would have been payable if the date of death was on or before December 31, 2001, and therefore no tax should be payable based on the actual date of death. The Director contends that the Legislature could not have intended that result. Additionally, the Director contends that the equitable doctrine of manifest injustice has been used sparingly and only in non-tax cases, and should not be extended to bar the retroactive application of the Amendment to plaintiffs.

## III.

We first address plaintiffs' argument that the plain language of *N.J.S.A.* 54:38–1(a)(2)(a) evinces a legislative intent not to impose taxes on an estate that would not have been subject to a federal estate tax under the law in effect on December 31, 2001.

We start with the notion that the general rules of statutory construction apply to tax statutes. *Am. Fire & Cas. Co. v. N.J. Div. of Taxation,* 189 *N.J.* 65, 78–79, 912 *A.*2d 126 (2006). When an administrative agency that is charged with enforcing a statute interprets that statute, we give substantial deference to the agency's interpretation. *GE Solid State, Inc. v. Dir., Div. of Taxation,* 132 *N.J.* 298, 306, 625 *A.*2d 468 (1993) (citing *Merin v. Maglaki,* 126 *N.J.* 430, 436–37, 599 *A.*2d 1256 (1992)). However, despite that deference, an administrative agency's interpretation will not be followed when the agency extends a statute "to give it a greater effect than its language permits." *Ibid.* Thus, if the agency interpretation of a statute is plainly at odds with the plain meaning of the statute, the agency interpretation will be set aside.

In determining the meaning of a statute, we consider first the plain language of the statute. If the language is clear, we interpret the statute consistent with its plain meaning. *Id.* at 307, 625 *A.*2d 468. If the language is not clear, we look to the legislative history to aid in determining the legislative intent of the statute. After all, our goal is to interpret the statute consistent with the intent of the Legislature. *State v. Lewis,* 185 *N.J.* 363, 369, 886 *A.*2d 643 (2005). Nevertheless, we "should strive to avoid statutory interpretations that 'lead to absurd or unreasonable results.'" *Ibid.* (citations and quotations omitted).

In this case, because the plaintiffs' and the Director's interpretations are reasonable, we resort to the legislative history to discern the meaning of the statute. As noted above, the legislative purpose in adopting the statute was to decouple our estate tax laws from the federal estate tax laws, because effective January 1, 2002, the federal law provided a substantial increase in

the estate tax deduction from $675,000 to $1,000,000. The Legislature sought to avoid the loss of estate tax revenues by maintaining the New Jersey estate tax at the level it was prior to the January 1, 2002 change in the federal law. In his decision below, the Tax Court judge looked to the legislative history of the Amendment to conclude that

> the Committee Statements provide that the Amendments were intended to result in computation of New Jersey estate tax as though the terms of the federal estate tax, including those governing liability for that tax and allowance of the state legacy tax credit, continued to apply to the estate of resident decedents dying after December 31, 2001 as they did to that of a resident decedent dying on that date. This language indicates that under the Amendments, the Director's responsibility is simply to determine estate distributions under the law in effect on the date of death and apply to those distributions the federal estate tax law in effect on December 31, 2001.
>
> [*Oberhand, supra,* 22 *N.J. Tax* at 60.]

That interpretation was the one advanced by the Director and is consistent with a plain reading of the statute. Because we give deference to the Director's interpretation of the Amendment, we accept that interpretation as the one intended by the Legislature.

Despite our agreement with the Director's interpretation of the Amendment, we recognize that plaintiffs' contention that the text of the statute indicates that the statute only applies to estates that would have owed a federal estate tax as of December 31, 2001, is a plausible reading of the statute. However, as the Tax Court observed, if plaintiffs' interpretation were correct, any estate could make that same argument and it would not be "confined to the period of retroactive application of the Amendments." *Oberhand, supra,* 22 *N.J. Tax* at 64. Plaintiffs concede that point.

We agree that the Legislature did not intend that even for "someone dying after July 1, 2002, (the date of enactment of the Amendments) an estate could claim that no tax would have been payable if the date of death was on or before December 31, 2001, and therefore no tax should be payable based on the actual date of death." *Id.* at 63–64. That would be an absurd result and we will not interpret the Amendment in that manner. *See State v. Lewis, supra,* 185 *N.J.* at 369, 886 *A.*2d 643.

Further, we reject plaintiffs' argument that our pronouncement in *Fedders Fin. Corp. v. Dir., Div. of Taxation,* 96 *N.J.* 376, 385, 476 *A.*2d 741 (1984), should lead to a different result. In *Fedders,* we stated that when the statutory language is in doubt and there is no legislative history to dispel that doubt, "the court should construe the statute in favor of the taxpayer." *Ibid.* Unlike in *Fedders,* in the present case the legislative history dispels any doubt. The statute is intended to tax transfers of assets after December 31, 2001 in excess of $675,000, the federal estate tax exclusion on December 31, 2001. Because the legislative history dispels any doubt in the interpretation of the statute, we find no reason to apply *Fedders.*

## IV.

Plaintiffs contend that the Appellate Division erred in rejecting the Tax Court's application of the doctrine of manifest injustice. As noted above, the Amendment was adopted on July 1, 2002, and made applicable to all decedents dying after December 31, 2001. Thus, the Amendment is retroactive for a six-month period.

## A.

■ Before discussing plaintiffs' manifest injustice argument, we comment generally on factors we consider in determining whether a statute should be applied prospectively or retroactively. To be sure, prospective application of a statute is favored over retroactive application. *Gibbons v. Gibbons,* 86 *N.J.* 515, 521, 432 *A.*2d 80 (1981).

> It is a fundamental principle of jurisprudence that retroactive application of new laws involves a high risk of being unfair. There is general consensus among all people that notice or warning of the rules that are to be applied to determine their affairs should be given in advance of the actions whose effects are to be judged by them. The hackneyed maxim that everyone is held to know the law, itself a principle of dubious wisdom, nevertheless presupposes that the law is at least susceptible of being known. But this is not possible as to law which has not been made.
>
> [*Id.* at 522, 432 *A.*2d 80 (quoting *Weinstein v. Investors Sav. & Loan Ass'n,* 154 *N.J.Super.* 164, 167, 381 *A.*2d 53 (App.Div.1977), *certif. denied,* 75 *N.J.* 598, 384

A.2d 828 (1978)); *see also Gen. Motors Corp. v. Romein,* 503 *U.S.* 181, 191, 112 *S.Ct.* 1105, 1111, 117 *L.Ed.*2d 328, 340 (1992) (noting that retroactive legislation "presents problems of unfairness that are more serious than those posed by prospective legislation, because it can deprive citizens of legitimate expectations and upset settled transactions").]

■■■■■ Nevertheless, if the Legislature expresses an intent that the statute is to be applied retroactively, the statute should be so applied. *Gibbons, supra,* 86 *N.J.* at 522, 432 *A.*2d 80. Moreover, the legislative intent may either be expressed in the language of the statute or implied in that "retroactive application may be necessary to make the statute workable or to give it the most sensible interpretation." *Ibid.* There are other situations that retroactive application is the better course. For example when the statute is "ameliorative or curative," it may be applied retroactively. *Id.* at 523, 432 *A.*2d 80.

■■■■ Despite a clear intent that a statute is intended to apply retroactively, we recognize two instances in which we will not apply it retroactively. First, we will not apply a statute "retroactively if retroactive application would be unconstitutional." *Nobrega v. Edison Glen Assocs.,* 167 *N.J.* 520, 537, 772 *A.*2d 368 (2001). Plaintiffs have abandoned that argument so we need not examine the constitutional issue. The final test we may consider in the retroactivity analysis is whether that application would result in "manifest injustice." *Ibid.*

In *Nobrega,* we expressly reaffirmed the manifest injustice doctrine, noting that "we have experienced no unique difficulty defining the contours of the manifest injustice standard." *Id.* at 546, 772 *A.*2d 368. To be sure, we have applied the manifest injustice doctrine sparingly. *Id.* at 546–47, 772 *A.*2d 368 (concluding "that applying the Disclosure Act retroactively to bar plaintiffs' claims would constitute manifest injustice"); *State Troopers Fraternal Ass'n v. State,* 149 *N.J.* 38, 56, 692 *A.*2d 519 (1997) (finding manifest injustice in retroactive application of administrative regulation amending back-pay rule because of "reasonable reliance" by employees on pre-amendment rule determining when

to retire or resign from employment). We turn now to address the manifest injustice analysis to the retroactivity inquiry.

### B.

 The doctrine of manifest injustice is "designed to prevent unfair results that do not necessarily violate any constitutional provision." *State Troopers, supra,* 149 *N.J.* at 54, 692 *A.2d* 519 (citing *Phillips v. Curiale,* 128 *N.J.* 608, 625, 608 *A.2d* 895 (1992)); *see Nobrega, supra,* 167 *N.J.* at 537, 772 *A.2d* 368; *Nelson v. Bd. of Educ. of Old Bridge,* 148 *N.J.* 358, 369, 689 *A.2d* 1342 (1997); *In re D.C.,* 146 *N.J.* 31, 50, 679 *A.2d* 634 (1996); *Edgewater Inv. Assocs. v. Borough of Edgewater,* 103 *N.J.* 227, 239, 510 *A.2d* 1178 (1986); *N.J. Dep't of Envtl. Prot. v. Ventron Corp.,* 94 *N.J.* 473, 498, 468 *A.2d* 150 (1983); *Gibbons, supra,* 86 *N.J.* at 523–24, 432 *A.2d* 80. "Hence, while our inquiry into whether there has been a 'manifest injustice' is informed by our consideration of issues of constitutional due process, it is not necessarily determined by those issues." *In re D.C., supra,* 146 *N.J.* at 58, 679 *A.2d* 634. In the manifest injustice analysis we "look to matters of unfairness and inequity" in determining whether to apply the doctrine to avoid the retroactive application of a statute. *Ibid.* "Because there is no litmus test for decision, we must consider in the weighing process the extent to which" the decedents were not able to change their Wills "in reliance on the existing law ... or had [their] reasonable expectations defeated." *Phillips, supra,* 128 *N.J.* at 625, 608 *A.2d* 895. "[R]eliance on existing law by the affected party and the unfairness of changing that law are the important factors in making the retroactivity decision." *In re D.C., supra,* 146 *N.J.* at 58, 679 *A.2d* 634. In evaluating those factors, a court must weigh "the public interest in the retroactive application of the statute against the affected party's reliance on previous law, and the consequences of that reliance." *Nelson, supra,* 148 *N.J.* at 372, 689 *A.2d* 1342 (citations omitted).

■ We turn now to weigh the respective interests of the parties to determine whether the doctrine of manifest injustice warrants relief to plaintiffs in this case. On its face, the Amendment represents a determination by the Legislature that there would be a loss of revenue to the State under the then-existing statute due to changes in the federal estate tax structure. The Statements appended to the bills demonstrate that concern. The Assembly and Senate Budget Committees projected significant revenue loss if our estate tax statute was not "decoupled" from its federal counterpart, evidencing a strong public interest in the application of the Amendment. Thus, there is an important public interest in the policy behind the Amendment.

That public interest, however, is not as relevant when viewed in the context of retroactive application of the Amendment. The Amendment was not intended to increase the estate tax revenues after December 31, 2001, but rather to prevent the loss of revenues resulting from changes in the federal law. Additionally, the lost revenue estimates contained in the Legislature's statements begin with Fiscal Year 2003 and do not estimate revenue that would be collected or lost as a result of the six-month period of retroactivity. Thus, there is no evidence that the public interest in preserving revenue for outlying years is as strong for the six-month retroactive period of the Amendment, as opposed to the period after adoption of the Amendment in July 2002. In short, the record does not reveal that the denial of retroactive application of the Amendment to plaintiffs' estates would seriously impact the State's revenues.

Conversely, the decedents relied on the previous law, and that reliance was patently reasonable. When the decedents executed their Wills and at the time that each died, the trust formulae were framed in such a fashion that no federal or state taxes would be due. It is clear that if the decedents had died on or before December 31, 2001, there would not have been any federal or state estate taxes due. It was solely due to the six-month retroactive application of the Amendment, coupled with the federal estate tax changes and the trust formulae, that the Director imposed State

estate tax assessments for the estates. Clearly, the decedents did not have an opportunity to amend their estate plans to avoid the adverse estate tax consequences. The reliance on the previous law by plaintiffs is obvious and clearly to their detriment.

In weighing the public policy of the State in retroactive application of the Amendment against the detriment that plaintiffs would suffer, we conclude that it would be harsh and unfair to apply the Amendment retroactively. Simply stated, plaintiffs' reasonable reliance on the prior law outweighs the public's interest in retroactive application of the Amendments. We are satisfied the Tax Court properly concluded that it would be manifestly unjust to apply the Amendment retroactively to the estates.

## V.

We affirm in part, and reverse in part, the judgment of the Appellate Division. We remand the matter to the Tax Court for further proceedings consistent with the views expressed herein.

Justice ALBIN, concurring.

Although I agree with the plurality that the retroactive application of *N.J.S.A.* 54:38–1 to the estates of Cynthia Oberhand and Eugene Seidner cannot stand, I reach that conclusion for different reasons. Unlike the plurality, I would not follow a line of cases decided by this Court, which have held that judges possess the power to strike down clearly-worded legislation based on equitable principles. A judge's sense of the unfairness or injustice of a statute, alone, cannot be the basis for upending a law duly enacted by the Legislature. As judges, it is not our role to pass on the wisdom of legislation. Statutory law, however, must conform to the supreme laws of our land—the New Jersey and United States Constitutions. Courts, through the power of judicial review, not only have the authority, but the duty to invalidate legislative enactments inconsistent with the provisions of our constitutional charters. The source of a court's powers to declare a law invalid rests on the higher law of our constitutions, not on judicially-crafted equitable principles.

For the reasons so powerfully and persuasively stated by Justice Wallace in the plurality opinion, *ante* at 573–74, 940 *A.*2d at 1210–11, I agree that the retroactive application of *N.J.S.A.* 54:38–1 to the Oberhand and Seidner estates is manifestly unjust—not because, as the plurality believes, the statute violates common law principles of equity, but rather because it violates Article I, Paragraph 1 of our State Constitution, which guarantees fundamental fairness and due process of law.

## I.

Until 1981, it was commonly understood in this State that a court could not nullify a duly enacted statute, even a retroactive one, unless the statute conflicted with either the State or Federal Constitution. *See, e.g., Baldwin v. City of Newark,* 38 *N.J.L.* 158, 159 (Sup.Ct.1875) ("Where the retrospective intention clearly appears on the face of a statute, the court will give it that effect, unless to do so would violate some constitutional provision."); *see also Howard Sav. Inst. v. Kielb,* 38 *N.J.* 186, 193–94, 183 *A.*2d 401 (1962) (implying same). Courts have long recognized that their inherent equitable powers to do justice cannot be invoked to restrain the effects of a statute. The common law principle that "equity follows the law" expresses the idea that a court exercising its equitable powers must bow to legislative precedents and not "unsettle" rights resting on legal principles created by statute. *Dunkin' Donuts of Am., Inc. v. Middletown Donut Corp.,* 100 *N.J.* 166, 183, 495 *A.*2d 66 (1985).

Even before ratification of the United States Constitution, the maxim "equity follows the law" was an accepted legal postulate. In 1785, Thomas Jefferson wrote that a court of equity "cannot interpose in any case against the express letter and intention of the legislature. If the legislature means to enact an injustice, however palpable, the court of Chancery is not the body with whom a correcting power is lodged." *Letter from Thomas Jefferson to Phillip Mazzei* (Nov. 1785), in 4 *The Works of Thomas Jefferson* 473, 476 (Paul Leicester Ford ed., 1904); *see also United*

*States v. Schooner Peggy,* 5 *U.S.* (1 *Cranch* ) 103, 110, 2 *L.Ed.* 49, 51 (1801) (Marshall, C.J.) ("If the law be constitutional . . . I know of no court which can contest its obligation.").

Despite the seemingly clear historical limitation on the equitable power of the judiciary, this Court issued a series of opinions, beginning in 1981, which support the approach taken by the plurality. *See Gibbons v. Gibbons,* 86 *N.J.* 515, 523–25, 432 *A.2d* 80 (1981); *see also Nobrega v. Edison Glen Assocs.,* 167 *N.J.* 520, 545–50, 772 *A.2d* 368 (2001); *2nd Roc–Jersey Assocs. v. Town of Morristown,* 158 *N.J.* 581, 604–05, 731 *A.2d* 1 (1999); *Gen. Motors Corp. v. City of Linden,* 150 *N.J.* 522, 540, 696 *A.2d* 683 (1997); *Nelson v. Bd. of Educ. of Old Bridge,* 148 *N.J.* 358, 369–72, 689 *A.2d* 1342 (1997); *In re D.C.,* 146 *N.J.* 31, 55–58, 679 *A.2d* 634 (1996); *Phillips v. Curiale,* 128 *N.J.* 608, 625–27, 608 *A.2d* 895 (1992); *Twiss v. N.J. Dep't of the Treasury,* 124 *N.J.* 461, 467–70, 591 *A.2d* 913 (1991); *Edgewater Inv. Assocs. v. Borough of Edgewater,* 103 *N.J.* 227, 239–41, 510 *A.2d* 1178 (1986); *N.J. Dep't of Envtl. Prot. v. Ventron Corp.,* 94 *N.J.* 473, 498–99, 468 *A.2d* 150 (1983). This Court's first pronouncement on the subject in *Gibbons, supra,* appears to have been based on a misapplication of the United States Supreme Court's use of the doctrine of "manifest injustice." 86 *N.J.* at 523–24, 432 *A.2d* 80 (citing *Bradley v. Sch. Bd. of Richmond,* 416 *U.S.* 696, 716–17, 94 *S.Ct.* 2006, 2018–19, 40 *L.Ed.2d* 476, 491 (1974), and *Thorpe v. Hous. Auth. of Durham,* 393 *U.S.* 268, 282, 89 *S.Ct.* 518, 526, 21 *L.Ed.2d* 474, 484 (1969)). To my knowledge, the "manifest injustice" doctrine under federal law has never been used to invalidate a clearly and unambiguously worded civil statute intended to apply retroactively. *See Bradley, supra,* 416 *U.S.* at 716–17, 717 n. 24, 94 *S.Ct.* at 2019 & n. 24, 40 *L.Ed.2d* at 491 & n. 24 (discussing *Greene v. United States,* 376 *U.S.* 149, 84 *S.Ct.* 615, 11 *L.Ed.2d* 576 (1964)); *Thorpe, supra,* 393 *U.S.* at 282 & n. 43, 89 *S.Ct.* at 526 & n. 43, 21 *L.Ed.2d* at 484 & n. 43 (same).[1]

---

[1] I agree with Justice Long's analysis that "manifest injustice" doctrine historically has been used as a canon of statutory interpretation when a court addresses an ambiguous statute and looks to divine legislative intent.

The only time this Court has invalidated the retroactive application of a state statute on grounds of "manifest injustice" was in *Nobrega, supra,* 167 *N.J.* at 545–50, 772 *A.*2d 368. Once our Court took its first misstep in *Gibbons,* the path ahead was supported by that erroneous precedent. I believe that we should retrace our steps and get back on the right track rather than march on under the banner of an insupportable legal doctrine.

The doctrine of *stare decisis*—of keeping faith with our precedent—serves the important purpose of ensuring "the stability of the law." *Lawrence v. Texas,* 539 *U.S.* 558, 577, 123 *S.Ct.* 2472, 2483, 156 *L.Ed.*2d 508, 525 (2003). *Stare decisis,* however, is not "an inexorable command." *Ibid.; see also White v. Twp. of N. Bergen,* 77 *N.J.* 538, 550, 391 *A.*2d 911 (1978). It is not a command to repeat the mistakes of the past. We should admit that this Court erred in its earlier cases and return to sound principles of constitutional jurisprudence. Invalidating the *N.J.S.A.* 54:38–1's retroactive application based on nothing more than this Court's own equitable principles, self-created in *Gibbons,* is a violation of our constitutionally-mandated separation of powers. *See N.J. Const.* art. III.

## II.

Our State Constitution allows us to accomplish the same end as the plurality—preventing manifest injustice—through constitutional means. Article I, Paragraph 1 of our State Constitution provides that

[a]ll persons are by nature free and independent, and have certain natural and unalienable rights, among which are those of enjoying and defending life and liberty, of acquiring, possessing, and protecting property, and of pursuing and obtaining safety and happiness.

[*N.J. Const.* art. I, ¶ 1.]

Article I, Paragraph 1, which sets forth the first principles of our governmental charter, protects our citizens from being deprived of their property through arbitrary governmental action. Although our State Constitution nowhere expressly states that our citizens are entitled to the equal protection and due process of the laws,

we have construed the expansive language of Article I, Paragraph 1 to embrace those fundamental guarantees. *Sojourner A. v. N.J. Dep't of Human Servs.*, 177 *N.J.* 318, 332, 828 *A.*2d 306 (2003). Simply put, the first paragraph of our State Constitution "protect[s] against injustice and against the unequal treatment of those who should be treated alike." *Greenberg v. Kimmelman*, 99 *N.J.* 552, 568, 494 *A.*2d 294 (1985).

Our Court has recognized that " '[f]undamental fairness is a doctrine that is an integral part of due process, and is often extrapolated from or implied in other constitutional guarantees.' " *Doe v. Poritz*, 142 *N.J.* 1, 109, 662 *A.*2d 367 (1995) (quoting *State v. Yoskowitz*, 116 *N.J.* 679, 731, 563 *A.*2d 1 (1989) (Handler, J., dissenting)). New Jersey's doctrine of fundamental fairness, which is encompassed within the protections of Article I, Paragraph 1 of our State Constitution, " 'serves to protect citizens generally against unjust and arbitrary governmental action.' " *Id.* at 108, 662 *A.*2d 367 (quoting *State v. Ramseur*, 106 *N.J.* 123, 377, 524 *A.*2d 188 (1987) (Handler, J., dissenting)). The present case is a perfect example of the exercise of arbitrary governmental authority at odds with the guarantees of Article I, Paragraph 1.

In this case, the plurality correctly states that the Legislature intended *N.J.S.A.* 54:38-1 to apply retroactively. *Ante* at 565, 940 *A.*2d at 1205-06; *see L.* 2002, *c.* 31, § 5 (providing that amendment to *N.J.S.A.* 54:38-1, signed by Governor on July 1, 2002, "shall apply to the estate of any resident decedent dying after December 31, 2001"). The retroactive application of *N.J.S.A.* 54:38-1 treats unequally the estates of only those people who had the misfortune to die between January 1 and June 30 of 2002. Cynthia Oberhand and Eugene Seidner prepared their wills relying on the then-existing estate tax laws in New Jersey. After their deaths in early 2002, the Legislature enacted a new estate tax law and retroactively applied it to January 1, 2002. Under the applicable law at the time of their deaths, the Oberhand and Seidner estates owed no New Jersey estate taxes. Under the retroactively applied law, both estates owed taxes.

Had Ms. Oberhand or Mr. Seidner been alive at the time of the passage of the new law, they would have been able to engage in tax planning and fashion their wills to eliminate the need for their estates to pay taxes. Changing the rules of the game after the game has been played is not permissible in a sports event and is contrary to fundamental notions of fairness guaranteed under our State Constitution when, as here, citizens rely to their detriment on the existing laws to make important financial decisions. Because Ms. Oberhand and Mr. Seidner died before passage of the new law, their financial decisions were irrevocable.

Manifest injustice and the denial of fundamental fairness are two ways of expressing the same concept. The statute's unequal and seemingly irrational treatment of the estates of those who died between January 1 and June 30 of 2002 cannot be squared with any conception of fundamental fairness under our State Constitution. I therefore would invalidate the retroactive application of *N.J.S.A.* 54:38–1 to the Oberhand and Seidner estates on constitutional grounds.

For those reasons, I respectfully concur.

Justice LONG, dissenting.

Because retroactive legislation undermines the ability of individuals to act in their own interests, to avoid acting in ways that will harm them, and "to plan [their] conduct with reasonable certainty of the legal consequences," it has always been considered unfair. Charles B. Hochman, *The Supreme Court And The Constitutionality of Retroactive Legislation,* 73 *Harv. L.Rev.* 692, 692 (1960). Indeed, "[t]he bias against retroactive laws is an ancient one." Elmer E. Smead, *The Rule Against Retroactive Legislation: A Basic Principle of Jurisprudence,* 20 Minn. L.Rev. 775, 775 (1936). The Greeks opposed retroactivity as unjust and Roman law contained the same admonition. *Ibid.* It was in connection with that view of retroactivity that the doctrine of manifest injustice developed in English common law where it took the form of a rule of interpretation. *Id.* at 776. The doctrine provided essentially that courts will not interpret a statute in a way that attributes an

unjust intention to the Legislature. *Id.* at 778. Because retroactivity was viewed as fundamentally unjust, where there was room for statutory interpretation, courts would invoke the doctrine of manifest injustice and apply statutes prospectively.

> [Y]et it was not applied as a rule of limitation on the power of the legislature. The courts and commentators viewed it as a rule to guide the courts, but that Parliament, if it desired, could pass a statute to apply to a past time was always clear. [Evidence] showed that the Prince could make a law operate retrospectively if he made it expressly clear that such was his will, and the common law followed this interpretation of the rule. Thus, this principle in the English common law meant that the courts, in the exercise of their function of interpreting the law in the cases which came before them, viewed themselves as bound by the rule of construction that no law should be given an operation from a time prior to its enactment unless Parliament had expressly provided that it should have such an effect or unless the words of the Act could have no meaning except by application to this past time. Because a retroactive law was unjust the judges insisted that they would not assume that Parliament meant a statute in general terms to be applied retrospectively.
>
> [*Ibid.* (footnotes omitted).]

Thus there has always been a clear line of demarcation regarding the applicability of the principle of manifest injustice—it can only apply to the interpretation of a statute but cannot affect the outcome where a clear statute requires retroactivity.

When the principle of manifest injustice found its way into the law of the United States, it took the same form as in England, as a rule of interpretation. *Id.* at 776. In the 1801 case of *United States v. Schooner Peggy,* 5 *U.S.* (1 *Cranch* ) 103, 2 *L.Ed.* 49 (1801), Chief Justice Marshall recognized the principle, acknowledging that although "a court will and ought to struggle hard against a construction which will, by a retrospective operation, affect the rights or parties," no court may contest its obligation, if the law is constitutional, to enforce Congress's intent to apply a statute retroactively. *Id.* at 110, 2 *L.Ed.* at 51. *See also United States v. Heth,* 7 *U.S.* (3 *Cranch.*) 399, 413, 2 *L.Ed.* 479 (1806) ("Words in a statute ought not be given retrospective operation, unless they are so clear, strong, and imperative, that no other meaning can be annexed to them, or unless the intention of the Legislature cannot be otherwise satisfied.").

Later case law from the United States Supreme Court entrenched the rule as one of construction and fleshed out its contours. In *Greene v. United States*, 376 *U.S.* 149, 84 *S.Ct.* 615, 11 *L.Ed.*2d 576 (1964), the Court denied retroactivity to a regulation, that was "not explicitly so requiring" such application because "the first rule of construction" requires a court to avoid retroactive operation of a statute that interferes with "antecedent rights ... unless such be 'the unequivocal and inflexible import of the terms and the manifest intention of the legislature.'" *Id.* at 160, 84 *S.Ct.* at 622, 11 *L.Ed.*2d at 584 (quoting *Union Pac. R. Co. v. Laramie Stock Yards Co.*, 231 *U.S.* 190, 199, 34 *S.Ct.* 101, 103, 58 *L.Ed.* 179, 182 (1913)) (citing in footnote *Claridge Apartments Co. v. Comm'r*, 323 *U.S.* 141, 164, 65 *S.Ct.* 172, 185 89 *L.Ed.* 139, 153 (1944); Smead, *supra*, 20 Minn. L.Rev. at 775–81).

Relying on *Greene*, the United States Supreme Court in *Bradley v. Richmond School Board*, 416 *U.S.* 696, 711, 94 *S.Ct.* 2006, 2016, 40 *L.Ed.*2d 476, 488 (1974) reiterated the notion that where legislative intent is clear, the legislation should be applied as written and that manifest injustice is not a part of the analysis. *See also* Mark Strasser, *Constitutional Limitations and Baehr Possibilities: On Retroactive Legislation, Reasonable Expectations, and Manifest Injustice*, 29 Rutgers L.J. 271, 300 (1998) ("[The Bradley Court] suggest[ed] that where legislative intent is clear, the legislation should be applied as intended.").

Somehow, with the passage of time, and despite citing the previously outlined United States Supreme Court precedents, our courts came to misunderstand the rule of manifest injustice as one empowering them to rewrite clear legislative enactments regarding retroactivity. *See, e.g., Nobrega v. Edison Glen Assocs.*, 167 *N.J.* 520, 772 *A.*2d 368 (2001); *Nelson v. Bd. of Educ. of Old Bridge*, 148 *N.J.* 358, 689 *A.*2d 1342 (1997); *In re D.C.*, 146 *N.J.* 31, 679 *A.*2d 634 (1996); *Phillips v. Curiale*, 128 *N.J.* 608, 608 *A.*2d 895 (1992); *Edgewater Inv. Assocs. v. Borough of Edgewater*, 103 *N.J.* 227, 510 *A.*2d 1178 (1986); *N.J. Dep't of Envtl. Prot. v. Ventron Corp.*, 94 *N.J.* 473, 468 *A.*2d 150 (1983); *Gibbons v.*

*Gibbons,* 86 *N.J.* 515, 432 *A.*2d 80 (1981). The source of the mistake was likely misconstruing manifest injustice as an "equitable" doctrine rather than as an interpretative yardstick. To be sure, the rule has equitable overtones insofar as it declines to attribute unjust intentions to the Legislature in statutory interpretation cases. That is quite different, however, from suggesting that courts have power to disregard clear legislative enactments because they are not in conformity with the court's view of what is fair.

I do not fault my colleagues for recognizing our prior precedent, only for failing to repudiate it. Our Constitution provides for the separation of powers. *N.J. Const.* art. III, § 1. Although the notion of separation of powers does not require "an absolute division among the three branches of government," *Gilbert v. Gladden,* 87 *N.J.* 275, 281 n. 3, 432 *A.*2d 1351 (1981) (citation omitted), we have recognized that "[i]ts purpose is to safeguard the 'essential integrity' of each branch of government." *Id.* at 281, 432 *A.*2d 1351 (citing *Massett Bldg. Co. v. Bennett,* 4 *N.J.* 53, 57, 71 *A.*2d 327 (1950)). Here, by applying the mistaken interpretation of the doctrine of manifest injustice adopted in our prior case law, my colleagues have infringed upon the "essential integrity" of the legislative process by substituting their own judgment for that of the Legislature and in so doing have continued us on the wrong path.

In my view, aside from a declaration of unconstitutionality, only two dispositions are available in this case. If the Court determines that *N.J.S.A.* 54:38–1 is either silent or ambiguous regarding retroactive effect, it can interpret the statute to avoid manifest injustice. On the contrary, if the Court declares the statute to unambiguously require retroactive application, there is no room for interpretation and the statute must be applied as written. Because we cannot both conclude that the Legislature has spoken clearly and unambiguously about its intentions and at the same time rely on our view of equity to achieve a different result, I

would affirm the judgment of the Appellate Division. I therefore respectfully dissent.

Justice HOENS join in this opinion.

*For affirmance in part/reversal in part/remandment*—Justices LaVECCHIA, ALBIN, WALLACE and RIVERA–SOTO—4.

*For dissent*—Justices LONG and HOENS—2.