SMALL, P.J.T.C.
These cases raise issues about the statute of limitations for refunds under the Sales and Use Tax Act. The applicable statute of limitations found in N.J.S.A. 54:32B-20(a) is four years. The Director of the Division of Taxation concedes that if the refund claims were timely filed they should be paid. The taxpayers concede that the claims for refund were filed more than four years after the taxes were paid. To be successful in their refund claim, the taxpayers must prevail in their arguments that because of the manner in which the sales tax was “collected” the four-year limit found in the statute is inapplicable. The taxpayers argue that because they unwittingly paid the sales tax and because they did not discover that they had paid $2,696,629.42 in sales tax until more than four years after they paid it, the statute should be extended. They argue that because the legislature mandated that (unlike in every other instance of collection of sales tax from *58 customers) the tax be included in, as opposed to being separately stated from, the price, the four-year statute is not applicable to these cases.
The Director argues that four years is what is written in the statute. The taxpayers are sophisticated, substantial enterprises. The four-year statute gave them more than adequate time to discover that they had been overcharged by Atlantic City Electric. The fact that they did not discover their overpayments until more than four years after those payments is no reason to modify the statute of limitations. The State should not indemnify them from funds the State had a legitimate right to consider beyond the reach of a refund claim. In fact the State paid $2,663,372.29 in refunds for claims that were filed within the four-year limitation period.
Underlying the conflict are the legitimate and sometimes mutually exclusive objectives of repose and accuracy.
For the reasons more fully explained below, I conclude that the statutorily enacted four-year limitations period is extended neither by (1) the legislature’s enactment of a statute “embedding” (or hiding) the sales tax by not requiring that it be separately stated from the purchase price, nor (2) the failure of the taxpayers, despite expensive, extensive, and ineffective efforts, to discover their overpayment of millions of dollars in less than four years. Although the State could, and arguably should have made it easier for taxpayers to discover overpayments, it was not obliged to extend the statute of limitations for having failed to do so.[1]
I.
During the period January 1, 1998 through March 17, 2004, Trump Plaza Associates, Trump Taj Mahal Associates, and Trump *59 Marina Associates, LP (the “Trump Entities”) purchased electricity from Atlantic City Electric (“ACE”) pursuant to Off-Tariff Rate Agreements (“OTRAs ”).
Electricity purchased under an OTRA is exempt from New Jersey Sales Tax (“Sales Tax ”). N.J.S.A. 54:32B-8.47b.
ACE charged sales tax on the monthly invoices for electricity purchased by the Trump Entities under the OTRA.
ACE did not separately state the sales tax on electricity on its invoices issued to the Trump Entities.
The Trump Entities filed two refund claims. One for the period April 1, 2001 through March 17, 2004. After investigation, the Director determined that the Trump Entities had overpaid the tax, the claim was filed within the four-year limitations period, and therefore a refund of $2,663,372.29 was paid. Realizing that refunds for the earlier period January 1, 1998 through March 30, 2001 (the “Refund Period”) posed the additional hurdle of the Director’s assertion of a statute of limitations defense, the Trump Entities filed a separate claim for that time period. It was denied on the basis that it had been filed late. It is that second claim for $2,696,623.42 which is the subject of this litigation. The sole issue to be determined is whether that second claim was timely filed or is barred by the statute of limitations.
In support of their positions, the parties filed Cross-Motions for Summary Judgment which were denied. During oral argument on those motions, the Trump Entities raised the possibility of an equitable exception to the four-year statute of limitations citing Toys “R” Us v. Director, Division of Taxation, 300 N.J.Super. 163, 692 A.2d 111 (App.Div.1997) and Airwork Service Division v. Director, Division of Taxation, 97 N.J. 290, 478 A.2d 729, cert. denied, 471 U.S. 1127, 105 S.Ct. 2662, 86 L.Ed.2d 278 (1985). In those cases the Appellate Division and our Supreme Court stated that the determination as to whether equity will compel a loosening of the doctrine of repose embodied in strictly construed tax statutes of limitations is fact sensitive. Accordingly, the Trump Entities and the State were given an opportunity to discover and prove the limits of a reasonable standard by which this court could *60 determine whether the Trump Entities, with the exercise of reasonable care, should have discovered that they were being charged sales taxes on their electricity purchases.
At that point, this court had already found that ACE should not have charged the Trump Entities sales tax on their electricity purchases.
There is no question that ACE included the tax in the price of electricity and did not, as in almost all other eases, state it separately. N.J.S.A. 54:32B-12(a) states:
If the customer is given any sales slip, invoice, receipt, or other statement or memorandum of the price, service charge, amusement charge or rent paid or payable, the tax shall be stated, charged and shown separately on the first of such documents given to him. [ (emphasis supplied).]
N.J.S.A. 54:32B-14(e) provides:
All sellers of energy or utility service shall include the tax imposed by the “Sales and Use Tax Act” within the purchase price of the tangible personal property or service. [ (emphasis supplied).]
The Trump Entities did not discover that the tax had been charged to them and that they had paid it until long after it made those payments to ACE. Each of the Trump Entities maintained an in-house accounting and audit department and established systems and procedures for the manner in which invoices were paid. From 1998 to 2001, the Trump Entities incurred employee expense in excess of $48 million in their non-casino accounting and auditing departments (about $12 million per year). The Trump Entities established Casino Control Commission approved procedures for the payment of ACE’s invoices.
Each of the Trump Entities employs a Director of Facilities, who reports to the Vice President of Hotel Operations and is responsible for the physical operation of each of the facilities. The Director of Facilities oversees and monitors the activities of the facilities relating to repair, maintenance, safety, environmental compliance, salary and wages, and energy consumption. The Director of Facilities is directly responsible for the annual budget and budgetary performance of his Department. The Director of Facilities supervises the Facilities Manager, who is responsible for preparing, coordinating, and monitoring the budget for energy *61 consumption. Every electricity invoice issued by ACE during the Audit Period was sent directly to the Director of Facilities for his review. The Director of Facilities reviewed and approved every electricity invoice received during the Audit Period and often solicited input from the Facilities Manager in connection with that process. Neither the Director of Facilities nor the Facilities Manager identified or reported any material discrepancy between the actual amounts paid to ACE and the budget for energy consumption during the Audit Period. Nor do they seem to have reported a discrepancy between the amounts billed and paid and the contract prices in the OTRA.
After reviewing and approving the electricity invoices from ACE, the Director of Facilities forwarded the invoices to the Accounting and Auditing Department for payment. It does not appear, because the plaintiff has submitted no certification, affidavit, or other evidence, that any of the Facilities Managers, Facilities Directors, or employees in the auditing or accounting departments ever cheeked the price, quantity consumed, and total invoice amount against the OTRA for even one of the hundreds of invoices submitted and paid from 1998 to 2004 by each of the Trump Entities.
Plaintiffs assert that they could not have exerted greater care in discovering that they had overpaid $2.5 million dollars. Yet they have failed to show that any of their Facilities Managers, Directors of Facilities, audit department, or outside auditors checked one of the many bills that they received from ACE to see if the charges were correct. Almost every bill for any good or service states the quantity consumed or purchased and the price per unit before stating the total due. To claim that the Trump Entities’ (or its many employees and hired professionals) failure to examine the details of the bills against its contracts reflects the exercise of great care is to turn the meaning of “great care” on its head. For whatever reason the Trump Entities, their employees and consultants chose not, or failed to examine their bills. The rest of the New Jersey taxpayers who have a right to be protected by statutes of limitations are now asked to underwrite this oversight and less than scrupulous bill paying practice.
*62 Examination of the attachments to the certification of Trump Plaza Associates’ Vice President of Finance illustrates the point. Certification of Daniel M. McFadden, July 30, 2007, Exhibit C & D within Exhibit A (Service Agreement) to contract between Trump Castle and Atlantic City Electric dated November 21,1996. The contract per day and per month charges are $8.33533 and $250.01, respectively. The bill for the period December 30, 1997 to January 29, 1998 states a per month price of $268.01. Subsequent bills indicated daily prices of $8,959 and $8,954. Similar discrepancies are found in the attachments to the Certification of Frederick T. Cunningham, Vice President of Legal Affairs for Trump Plaza Associates. The discrepancies with regard to energy consumption undoubtedly show similar errors which no one discovered before the expiration of the four-year statute of limitations.
A review of the monthly bills of Trump Plaza during the audit period shows monthly bills for electricity of between $250,000 and $500,000. At oral argument, plaintiffs’ counsel indicated that monthly electricity bills for the three Trump Entities during the refund period ranged between $100,000 and $1 million per month.
The Trump Entities are owned by a publicly-traded company, Trump Entertainment Resorts, Inc. (f/k/a Trump Hotels & Resorts, Inc).
In addition to United States Securities and Exchange Commission (the “SEC ”) oversight, the Trump Entities are also subject to strict regulation by the Casino Control Commission.
During the Refund Period, the Tramp Entities retained Arthur Andersen LLP (“Andersen") to audit their financial systems, procedures, and statements for SEC and Casino Control Commission purposes. For each Refund Period year, Andersen issued an opinion stating that the Trump Entities’ financial systems, procedures, Sid financial statements complied with generally accepted accounting principles (“GAAP ”). The Trump Entities also hired Andersen to certify to the Casino Control Commission that: (1) the Trump Entities’ internal accounting controls did not contain any material weaknesses; and (2) their internal accounting sys *63 terns followed in all material respects the internal accounting controls approved by the Commission.
The Commission also required that each Trump Entity file additional reports and certifications, such as: (1) a detailed description of its initial system of internal procedures and administrative and accounting controls for its gaming and wagering operations, (2) a certification from its Chief Legal Officer that the procedures comply with the New Jersey Casino Control Act, (3) a certification from the Chief Financial Officer that the overall system of internal procedures and administrative and accounting controls conform to generally accepted accounting principles, and (4) quarterly financial statements. The Trump Entities were not permitted to operate their facilities without a casino license and the Commission has broad discretion with regard to the issuance, renewal, revocation, and suspension of such licenses and approvals. Each time a Trump Entity applied to have its casino license renewed, the Commission conducted a detailed review of the Trump Entities’ financial stability and integrity. In June 1999 and June 2003, the Commission renewed the Trump Entities’ casino licenses.
The Division of Taxation conducted two rounds of comprehensive Sales tax audits on each of the Trump Entities (i.e., six audits in total). During both rounds of audits, the Division had complete access to the Trump Entities’ accounts payable records, including all records related to or associated with OTRA purchases. Relying on the results of the first round of audits, the Trump Entities applied the Division’s audit methodology to extrapolate and self-assess additional Sales tax liability for the period that fell between the Division’s two rounds of audits. The Division approved the results of these self-audits. At no time during or after either round of the Division’s audits did the Division inform any of the Trump Entities that they had paid the Sales tax on their purchase from ACE
Neither Arthur Andersen, nor any of the various regulatory agencies appears to have checked individual invoices from ACE against the OTRA’s. Nor is there any requirement brought to the *64 court’s attention that any of the regulatory agencies check any of those invoices. By statute no tax was due on electricity purchased by the Trump Entities under the OTRA’s, accordingly there would be no reason for the Division of Taxation to have audited either those invoices or those accounts.
On August 25,1999, the Trump Entities each engaged Andersen to review and examine their accounts payable to determine whether the appropriate amount of Sales tax was being paid. Andersen apparently found nothing. On November 11, 2003, the Trump Entities each engaged Ernst & Young (E&Y) to conduct a similar review of its Sales tax payments. Andersen and E&Y had access to and reviewed and analyzed the Trump Entities accounts payable records in performing the sales tax review. We are told this by a Trump employee so it may be hearsay and because neither Andersen nor E&Y found the Sales tax overpayments one must question the thoroughness of their work. One can also ask whether the amounts involved for the Trump Entities were significant. Maybe a $2.5 million oversight is not a significant amount for a $48 million auditing staff. Should the Division of Taxation and the taxpayers of New Jersey, which and who are protected by statutes of limitations for refund claims, insure the Trump Entities, their employees, officers, and directors and their outside consultants from failure to find the overpayments to ACE, or is that liability to fall on those who failed to check bill prices against contract prices?
The Trump Entities retained both Andersen and E&Y to perform the sales tax reviews on a contingency basis. Thus, the reviewer’s fee increased in direct proportion to the amount of Sales tax refunds they identified and obtained for the Trump Entities. In spite of this incentive, neither Andersen nor E&Y found the sales tax payments. Andersen subsequently went out of business.
In 2005, the Tramp Entities hired Blank Rome LLP to conduct another audit of their sales tax records. Blank Rome recommended that the Trump Entities investigate whether ACE had charged Sales tax on the OTRA invoices.
*65 ACE, prior to the completion of its detailed internal investigation in 2005, was not even aware that it had been collecting sales tax on the OTRA sales. The contract between ACE and the Trump Entities had a twelve-month period within which the Trump Entities could make claims for overcharges. (Three years less than the sales tax refund claim statute of limitations.) Despite its right to claim overcharges from ACE within one year, the Trump Entities’ accounting department failed to review or detect any errors in the bills within that period. Following a month of investigation, ACE finally admitted that it had been erroneously charging Sales tax to the Trump Entities.
The Trump Entities were not the only entities that had willingly paid Sales tax improperly charged to them. Both ACE and Public Service Electric and Gas Company (“PSE & G”) improperly charged and collected Sales tax with respect to OTRA electricity charges from twenty-five of their customers. None of those customers sought a refund of those taxes before the Trump Entities sought such refunds. Based upon certifications from two of those other customers of ACE, it is clear that none of the taxpayers knew that they had been paying Sales tax on OTRA electricity charges. And it appears that none of them had checked their electricity bills against the OTRA rate schedules. Should the Division of Taxation and the taxpayers of New Jersey indemnify a large, sophisticated company that entered into complex rate agreements which were approved by the BPU and then failed, until it found Blank Rome, to hire inside or outside clerks, auditors, and accountants who were competent to find both ACE’s and Trump’s errors?
The Division of Taxation when presented with valid and timely refund claims paid full refunds of $2,663,372.29. The Division relied on the statutory limitation periods to retain revenues for closed periods. The Trump Entities took advantage of their ability to negotiate sophisticated tax free OTRA agreements. They need not be indemnified by the taxpayers of New Jersey for their failure to adequately monitor the implementation of their agreements. The fact that these errors escaped notice by an accounting staff and two of the nation’s biggest accounting firms is *66 no reason to find that the Division of Taxation must indemnify the Trump Entities. Why not ask ACE to waive its twelve-month statute of limitations or file claims against the employees and accounting firms who failed to detect the overpayments that only Blank Rome could find? Are the taxpayers of New Jersey protected by four-year statutes of limitation (three years more than the period of claims against ACE) to waive those protections because the Trump Entities’ accounting departments could not find the over billing?
The equities for extending the four-year statute of limitations in these circumstances are hardly compelling, and the Director on behalf of all of the other taxpayers should not be ordered to waive its protection.
II.
Sales tax is, in general, imposed on the sale of electricity in New Jersey. Prior to 1997 it was not. L. 1997 c. 162 imposed the tax in a fundamental restructuring of the way in which utilities were taxed by New Jersey.
Generally sales tax must be stated separately and added on to the purchase price of goods and services subject to tax. N.J.S.A. 54:32B-12(a). However, in the case of electricity, sales tax is included in the price and not stated separately. N.J.S.A. 54:32B-14(e).
Under OTRA pricing there is no sales tax imposed. N.J.S.A. 54:32B-8.47. It would appear that ACE failed to reprogram its computers to calculate charges under OTRA agreements differently from the way the program calculated charges for non-OTRA customers by eliminating the sub-program which added sales tax.
The Trump Entities place great weight on Toys “R" Us v. Director, Division of Taxation, supra. In that case, a field agent relied on a superseded position of the Director of Taxation to assess and collect sales tax. Five months later, the plaintiff came across the Director’s superseding published interpretation and filed a claim for refund. Relying on a statute that requires an aggrieved taxpayer to challenge an assessment within 90 days, the *67 Director denied the refund. N.J.S.A. 54:32B-19. See Don Dan Const. Co. v. Director, Div. of Taxation, 14 N.J. Tax 569, 572 (1995). In Toys “R” Us, the Appellate Division found that because the Division of Taxation auditor was relying on an outdated and revoked position of the Director while the Director had at the same time taken and published a different position, the Director had denied the taxpayer’s “basic rights of fair and equitable treatment” under the Taxpayers’ Bill of Rights. Toys “R” Us, supra, 300 N.J.Super, at 172, 692 A.2d 111. The matter was remanded for a determination as to whether the Director’s stating conflicting positions at the same time would estop the Director from holding a taxpayer to a statute of limitations in denying a refund. As a general rule estoppel does not limit the government when it has previously taken a position inconsistent with a position which is in accord with a taxing statute. See cases cited in Black Whale, Inc. v. Director, Div. of Taxation, 15 N.J. Tax 338, 353-55 (1995).
This case is entirely different. ACE overcharged the Trump Entities and remitted that overcharge to the State. The Trump Entities willingly, absentmindedly, or carelessly paid (not as the result of an audit by the Division of Taxation) those overcharges. Despite its own review at the operational, accounting, and audit levels and two subsequent reviews by major accounting firms, it did not ask ACE for the money back (it had twelve months under its contract) or seek a refund from the Division of Taxation (which the statute protected from a refund claim only after the passage of four years). The Division played no role in assessing, advising, or collecting (other than as a passive recipient) these funds. In Toys “R” Us, the Director might have been at fault in the taxpayer’s payment of the assessed amounts. Here, the Director played no role in ACE’s billing, the Trump Entities’ paying, nor the Trump Entities’ and their auditing staff and accounting firm’s failure to discover the error in less than four years. The Director cannot be said to be equitably estopped from asserting protection under a statute of limitations when so many others responsible for and to the Trump Entities failed to perform basic bill checking so that the Trump Entities could timely assert their rights.
*68 In a recent case, the Appellate Division rejected the contention that the Director could be equitably estopped from asserting the protection of a four-year statute of limitations under the Sales and Use Tax Act. M.J. Ocean Inc. v. Director, Div. of Taxation, — N.J. Tax-, 2009 WL 62943 (App.Div.2009), affg, 23 N.J. Tax 646 (2008). Judge Kuskin had pointed out that the change in the Director’s interpretation of the law at or around the time that an assessment had been made was an “unusual eircumstance[ ].” He found that it was that unusual circumstance which led the Appellate Division in Toys “R” Us, supra, to give the taxpayer an opportunity to establish the basis for equitable relief. 23 N.J. Tax at 656. Most of his opinion reviewed the almost black letter law that in tax matters there is no equitable relief from the strict enforcement of refund statutes of limitations. 23 N.J. Tax at 651— 56.
Statutes of Limitations are not manifestly unjust. Our sharply divided Supreme Court has held that the imposition of taxation retrospectively may be manifestly unjust in certain very carefully confined cases. See Oberhand v. Director, Div. of Taxation, 193 N.J. 558, 940 A.2d 1202 (2008). In this case, the statute under which plaintiffs were exempt from tax was in place before they mistakenly were charged and paid the tax. The statutes limiting the time for the Trump Entities to seek a refund were in place long before the time the Trump Entities were improperly charged and mistakenly paid the tax. The legislature took no action after the Trump Entities were (1) improperly charged by ACE, (2) mistakenly or voluntarily paid, and (3) failed (by their own accounting department and outside consultants) to find the error for over four years. Neither the Director nor the legislature was the cause of plaintiffs’ mistakes.
Taxpayers in New Jersey should not be forced by this court to indemnify the careless practices of ACE, Trump, Arthur Anderson, and Ernst and Young. The laws were written, the contracts were written, the bills were written, the checks paying the bills were written, and the letters of engagement with Arthur Anderson and Ernst and Young were written. Failure to critically read all of this writing is neither the Director’s fault nor the fault *69 of the other taxpayers of New Jersey. Those not at fault need not indemnify those who had the ability to review bills before they paid them. Had the state failed to make an assessment within four years, these same entities undoubtedly would have been the first to assert the protection of their four-year statute of limitations. Having made mistakes and failed to discover them within the same four years, the Trump Entities have no equitable claim for a refund of their overpayment of taxes.
III.
In 1996, the Trump Entities negotiated specific OTRA agreements with ACE. Each agreement had a complex, but fully disclosed rate schedule, with rates varying by such variables as time of year, quantity of purchase, and time of day. Each invoice to the Trump Entities disclosed the quantity of electricity purchased at each rate. Had the Trump Entities’ Facilities Managers, Facilities Directors, accounting department, or outside advisers taken the time to check the amount charged for the quantity consumed, they would have discovered (as did Blank Rome) that the rates being charged were in excess of the amounts specified in the OTRA agreements. These overcharges were not discovered until Blank Rome advised the Trump Entities to perform these audits. Had the audits been performed within four years of payment of ACE’s invoices, timely refund claims could have been made and in fact were made. Had the Trump Entities reviewed their bills before they paid them, they would have never paid the improperly charged sales tax.
To claim that the statutory requirement that the tax not be separately stated somehow entitled the Trump Entities to an unlimited time to seek a refund is absurd. Perhaps the Trump Entities might argue that the contract they had with ACE limiting claims to one year was void because ACE overcharged them. The State did not overcharge Trump — ACE did. The State was a passive entity which received these excessive payments. But whether the State is shortchanged or overpaid, the applicable statute of limitations entitles it, and the other New Jersey taxpayers, to repose after a four-year period.
*70 There is no persuasive argument which leads to a conclusion that the statute of limitations for a separately stated tax is shorter than for a tax included in a sales price. Failure to check an invoice before it is paid has a risk which the Trump Entities assumed and against which the State does not insure — beyond the four-year limitation period.
Judgments will be entered denying the plaintiffs’ claims for refund and dismissing their complaints.

 The reasons why the legislature may have chosen to require sales tax to be stated separately in most cases and included in the purchase price in others is not a proper area of inquiry for this court unless constitutional due process issues are raised. The standard under which tax statutes are judged under the Due Process Clause, rational basis, is an easy one for the State to meet. This court does not sit in judgment of the wisdom of permissible choices made by the Executive and Legislative branches of government.